[Civ. No. 51233. Second Dist., Div. Three. Mar. 28, 1978.]

MARC MIKIALIAN, Plaintiff and Appellant, v.
CITY OF LOS ANGELES et al., Defendants and Respondents;
CNA CASUALTY OF CALIFORNIA, Intervener and Appellant.

**COUNSEL**

James H. Davis, Al Schallau and Setha Schlang for Plaintiff and Appellant.

Chase, Rotchford, Drukker & Bogust and Garry W. Williams for Intervener and Appellant.

Burt Pines, City Attorney, John T. Neville, Assistant City Attorney, and Daniel U. Smith, Deputy City Attorney, for Defendants and Respondents.

## OPINION

**POTTER, J.**—Plaintiff Marc Mikialian and plaintiff-in-intervention CNA Casualty of California appeal from a judgment of nonsuit in favor of defendants and defendants-in-intervention City of Los Angeles, Bruce Watkins, A. Castro, and Thomas R. Whetzel.[1]

Plaintiff's complaint sought damages for personal injury sustained by him when he was struck by a hit-and-run driver while attempting to install a dolly under a front wheel of an automobile which he had taken in tow with his tow truck. CNA's complaint in intervention was brought in subrogation pursuant to Labor Code section 3852; it was the worker's compensation insurance carrier for Archer's Towing Service, the employer of plaintiff.

When plaintiff was struck, he was afoot on the traffic side of the towed vehicle which, together with his tow truck, was parked at the east curb of Vineland Avenue near its intersection with Sherman Way in the City of Los Angeles. The vehicle which hit him was northbound on Vineland, which at that point comprised a median strip 10 feet in width, a center lane 11 feet in width on either side, and a 24-foot outer lane on either side to the curb. Archer's Towing Service had been designated an official police garage by the Board of Police Commissioners of the City of Los Angeles, thereby qualifying to perform tow services for the police pursuant to rules for such garages. Plaintiff responded to a request for a tow vehicle in connection with a two-car collision in the southbound lanes of Vineland which resulted in one vehicle leaving the roadway, crossing the sidewalk and coming to rest with its front end into a fence. Since the driver of this vehicle was taken into custody and its rear protruded perpendicularly into the traffic lane on the west side of Vineland, the officers investigating the collision called for the tow truck to remove it from its position astride the sidewalk and to impound it.

---

[1]Though the judgment specifically refers only to "defendant, City of Los Angeles," and decrees "that defendant have and recover judgment against plaintiff and plaintiff-in-intervention," the court discharged the jury upon granting the nonsuit, thereby terminating the action as to all defendants. The motion for nonsuit urged the same contentions in behalf of all defendants. Consequently, we will treat the appeal as an appeal from a judgment of nonsuit in favor of all defendants.

When plaintiff, an experienced tow truck operator, arrived at the scene he parked his truck at the curb on the east side of Vineland opposite the accident scene. He crossed over to the locality of the damaged vehicle and discussed the disposition of it with an officer. He then returned to the tow truck and drove it to a position where the rear of the damaged vehicle could be attached and lifted. When it was so attached, plaintiff drove eastward across Vineland and turned north parallel to the eastern curb, where he parked.

During the course of his testimony at the trial, plaintiff testified three times that the officers at the scene directed him to take the impounded car to the east side of Vineland. Each of these statements was to the same effect: that plaintiff was instructed to get the car out of the water (which filled the gutter at the place it occupied) "and put it back across the street." One such statement was made in the course of plaintiff's direct examination.

In cross-examination, plaintiff's deposition testimony, given nine months before the trial, was read as follows: "Q. Did anyone direct you to pull the Chrysler across the street onto Vineland? A. No, sir." Plaintiff acknowledged that he had made that statement under oath at his deposition.

Shortly thereafter, at the trial, in response to a question as to whether he had told the officers that he was going to tow the car to the east side of Vineland, plaintiff responded: "A. No, sir. I assumed that is where they wanted me to take it."

Later, in cross-examination, plaintiff stated for the second time that he had been told to "get it out of the water and put it back across the street." However, two pages further in the transcript, the following questions and answers appear: "Q. Then it was his decision to move the vehicle across the street northbound; is that correct? A. No, sir. It was more or less my decision. He just told me to get it out of the water. Q. In fact, you made the decision to move it to the east side of the street then pull it north, did you not? A. Yes sir. Q. And you made the decision because you thought it would be the easiest way to get the car off the fence and to get it out of the traffic; isn't that true? A. Yes, sir."

A comparable explanation of the reason the tow truck was placed on the east side of Vineland was also given in plaintiff's deposition which was read in evidence. This deposition testimony was as follows: "Q. You

made that decision to pull it northbound yourself; is that correct? A. Yes, sir. Q. How did you pull it across? What directions did your vehicle actually move? A. Well, before I pulled it across, my truck was facing the east side of the curb. Q. Eastbound; is that correct? A. Yes. So the easiest way and the quickest way to get it off the sidewalk and the fence was to just continue eastbound and to pull lengthwise up against the curb. Q. Mr. Mikialian, is there any reason why you didn't proceed southbound on Vineland when you pulled the vehicle off the fence? A. Yes, sir. Q. What is the reason? A. Because at that time it was much easier, much quicker to pull it into the northbound lanes. That way I would get my truck and the car out of the way so traffic could proceed freely. I was going to finish my procedure and then go over to the southbound lanes. Q. So that was the reason you went to the east side? A. Yes, sir."

On redirect examination, plaintiff was asked what his understanding was at the time. The question and answer in this respect were: "Q. What was your understanding of what you were to do, Mr. Mikialian? A. Get it out of the water and get it to an area that was dry."

At no time did plaintiff attempt to correct his deposition or indicate in any way that he misunderstood the questions, misspoke himself in giving his answers, or was confused or mistaken in any respect.

The officers who spoke to plaintiff were both called as witnesses for plaintiff. One of them, Watkins, denied that he gave plaintiff any instructions as to where to take the impounded vehicle. The other, Whetzel, was not asked whether any such directions had been given. Both officers, however, testified that they were aware at the time that plaintiff had towed the vehicle across the street and had parked near the curb on the east side of Vineland.

There was evidence offered by plaintiff to the effect that the usual procedure when vehicles were impounded required the preparation of an inventory of the contents of the impounded vehicle. Such inventory was prepared and was signed by the officer in charge and countersigned by the tow truck operator before the impounded vehicle was removed from the scene of the accident. This evidence also showed (1) that no unusual arrangement had been made in this case, and (2) that although an inventory report had been completed by one of the officers at the scene, it had not been delivered to plaintiff for his signature. Thus, plaintiff was required to wait until he received the inventory report from the officers before he could leave. Officer Whetzel gave testimony in his

deposition to the effect that he thought at the time that plaintiff was filling out the inventory report.

There was, however, no evidence indicating that any of the officers were aware of the fact that plaintiff was engaged in activities involving his occupying a position on the traffic side of the parked tow truck and impounded vehicle.

The tow vehicle was equipped with a large number of illumination devices to warn oncoming motorists of its presence. It had a rotating amber light, two rear-facing amber spotlights, and two rear-facing white floodlights, all mounted atop the lifting hoist frame. The usual taillights, which were operable as flashing emergency lights, were mounted at the rear of the truck and provision was made for portable extensions to be attached to the rear of the towed vehicle. At the time plaintiff was struck by the hit-and-run driver, the flashing yellow light, the amber fixed lights, and the truck taillights were in operation. Plaintiff had not, however, attached the portable extensions nor had he activated the flashing emergency feature of the truck's taillights or the white floodlights. No warning flares were placed in the northbound lanes of Vineland by plaintiff or by any of the officers.

The place where the tow truck was located at the time of plaintiff's injury was northerly of a railroad grade crossing of Vineland. The railroad crossing was above the level of the street (to the north and to the south) to a sufficient degree that it obscured northward visibility from vehicles south of the tracks. The precise distance between the railroad tracks and the point where the tow truck was parked on the east side of Vineland was not definitely established though it was clear that it was in excess of 375 feet. At that distance northerly there was located the southernmost of a series of "no parking any time" signs prohibiting parking due to the proximity of the runways of the Burbank Airport.

Testimony offered by plaintiff from retired police officers was to the effect that the tow truck and vehicle parked in that location constituted a hazard which called for the placement of a flare pattern. In his deposition, Officer Whetzel conceded that there was a blind spot for northbound traffic. There was, however, no proof that the officers at the scene were aware of this circumstance at the time of plaintiff's injury.[2]

---

[2]Appellant's contention that both the officers were also on notice that the hump on the road "was dangerous because it has figured in the very accident they were investigating" is unsupported by the record which shows only that location of that accident was

The photographs of the tow truck taken after the accident show damage to the door on the driver's side. The sheet metal is pulled outward at the bottom rear corner of the door, and there is slight damage to the leading edge of the door and to the adjoining fender indicating that the door was forced forward of the normal full open position. There is no other damage to that side of the tow truck which generally protrudes several inches outboard of the door. It is apparent that at the time of impact the door was wide open and only the outboard tip was contacted, so the path of the hit-and-run vehicle was such as to totally miss the parked tow truck and impounded vehicle if the door had not been open.

In ruling on the motion for nonsuit, the trial court indicated several bases upon which he concluded that plaintiff's evidence failed to show liability. These included (1) the lack of a showing of facts giving rise to a duty on the part of the officers to place flares around plaintiff's truck, (2) failure of plaintiff to prove that the absence of flares was a proximate cause of the injury, and (3) governmental immunity based upon Government Code section 820.2 (discretionary acts . . .) and section 845 (failure to provide sufficient police protection).

*Contentions*

Appellants contend (1) that there was substantial evidence from which the jury could find the officers were under a duty "to place flares around plaintiff's tow truck"; (2) that no governmental immunity was applicable; and (3) that there was substantial evidence that the absence of flares was a proximate cause of plaintiff's injury.

Respondents controvert appellants' contentions 1 and 2 and rely upon the so-called "fireman's rule"[3] as additional support for the trial court's ruling.

---

described in relation to the location of the railroad tracks. Both of the vehicles in the original collision were in the southbound or westerly lanes of Vineland and northerly of the railroad tracks. There is nothing to suggest that at any time prior to the collision either one of them was northbound on Vineland so that the existence of the "blind spot" could have been a factor in such accident.

[3]See *Walters v. Sloan,* 20 Cal.3d 199, 202 [142 Cal.Rptr. 152, 571 P.2d 609].

*Discussion*

■ Plaintiff's testimony in his deposition and at the trial contained clear admissions of fact negating the claimed duty of the police officers. No attempt was made to withdraw or explain these admissions. Testimony of plaintiff simply contradicting these admissions did not constitute substantial evidence creating an issue of fact. Such being the case, we find it unnecessary to discuss governmental immunity or proximate cause or the so-called "fireman's rule."

" '. . . If right upon any theory of the law applicable to the case, [the judgment must be affirmed] regardless of the considerations which may have moved the trial court to its conclusion.' [Citation.]" (*D'Amico* v. *Board of Medical Examiners,* 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)

■ Every negligence case presents a threshold question of whether the defendant has violated any duty to the plaintiff. Unless plaintiff can show the existence of such a duty and a violation thereof by substantial evidence, it is the duty of the trial court to grant defendant's motion for nonsuit. In *O'Keefe* v. *South End Rowing Club,* 64 Cal.2d 729 [51 Cal.Rptr. 534, 414 P.2d 830, 16 A.L.R.3d 1], our Supreme Court affirmed the judgment of nonsuit on the basis that a violation of duty had not been shown by substantial evidence. The court stated the standard applicable to such judgments and the duty of the trial court as follows (*id.,* at pp. 733, 746):

"The rule is familiar that 'A nonsuit may be granted only where, disregarding conflicting evidence on behalf of the defendants and giving to plaintiff's evidence all the value to which it is legally entitled, therein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is *no evidence of sufficient substantiality* to support a verdict in favor of the plaintiff.' (*Reynolds* v. *Willson* (1958) 51 Cal.2d 94, 99 [331 P.2d 48]; *Blumberg* v. *M. & T. Incorporated* (1949) 34 Cal.2d 226, 229 [209 P.2d 1]; *Estate of Lances* (1932) 216 Cal. 397, 400 [14 P.2d 768].) . . .

" .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"When, as here, the evidence at the close of the plaintiff's case is so palpably insufficient that the trial court determines that no verdict for plaintiff could be sustained, it is the duty of the court to forestall the cost

and delay of further proceedings by granting defendant's motion for nonsuit. . . ." (Italics added.)

Plaintiff was injured in this case allegedly as the result of an omission (the failure of the officers to place flares for his protection). Such an omission is nonfeasance, and "liability for nonfeasance is largely limited to those circumstances in which some special relationship can be established. . . ." (*Weirum* v. *RKO General, Inc.,* 15 Cal.3d 40, 49 [123 Cal.Rptr. 468, 539 P.2d 36].) As this court said in *Mann* v. *State of California,* 70 Cal.App.3d 773, 779 [139 Cal.Rptr. 82], a defendant "can be held liable for these negligent omissions only if a special relationship then obtained between him and plaintiff. . . ."

The Restatement Second of Torts, section 314, page 116, states: "The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." Restatement Second of Torts, section 314A, lists four categories of special relationships giving rise to such duty, with the caveat that no opinion is expressed "as to whether there may not be other relations which impose a similar duty." (*Id.,* at p. 119.) Comment "b" states: "The law appears, however, to be working slowly toward a recognition of the duty to aid or protect in any relation of dependence or of mutual dependence." (*Ibid.*)

The keystone of plaintiff's claim of a special relationship was his assertion that the officers directed him to take the tow truck and impounded vehicle across Vineland and park them on the east side where they were in a blind spot for northbound traffic. The inventory report had not been completed by the officers and signed by plaintiff. Pursuant to the Rules Governing Official Police Garages of the Los Angeles Police Commission, plaintiff was required to "abide by the decisions of police officers and . . . cooperate in removing hazards, illegally parked vehicles, and in impounding vehicles." (Rule 4.) If the officers had directed plaintiff where to park until the paper work was completed, the exercise of such control would have placed him in a position of dependence upon the officers.

At trial, plaintiff testified three times that he was directed where to park. However, in his deposition he unequivocally stated that no one directed him to park on the east side of Vineland, and that the decision to park there was his own, dictated by the greater ease of this maneuver.

These unequivocal statements in his deposition were confirmed by his trial testimony that it was his, and not the officers', decision to move the vehicles to the east curb of Vineland. Even on redirect examination, when offered the opportunity to reconcile or explain his prior statements by stating his understanding as to what he was to do, plaintiff answered, "[g]et it out of the water and get it to an area that was dry," and made no reference to any alleged directive that he park on the east side of Vineland.

If plaintiff's testimony in this respect as given in his deposition was in error, he had nine months prior to trial within which to correct it. Had he done so, he would have been called upon to explain the former testimony as a misreporting of his answers, a mistake on his part, or the product of a misunderstanding. Such an explanation would have created a fact issue. But plaintiff did not choose this course. He chose, instead, simply to make contradictory statements to the effect that he was directed where to park while continuing to make corroborative admissions that the decision was his own. Under these circumstances, we conclude that there was no substantial evidence that the officers directed plaintiff where to park.

The same problem has been presented repeatedly in cases where summary judgments have been sought on the basis of admissions or concessions made in the course of pretrial depositions.

In several such cases the party opposing summary judgment has attempted to create an issue of fact by filing a counteraffidavit which simply contradicts the previously made admissions. Our Supreme Court discussed the earlier cases in *D'Amico* v. *Board of Medical Examiners, supra*, 11 Cal.3d at pages 21-22, where it was said:

"Moreover, when discovery has produced an admission or concession on the part of the party opposing summary judgment which demonstrates that there is no factual issue to be tried, certain of those stern requirements applicable in a normal case are relaxed or altered in their operation. Thus, in *King* v. *Andersen, supra*, 242 Cal.App.2d 606 [51 Cal.Rptr. 561], the rule providing for liberal construction of counteraffidavits was held not to require reversal of a summary judgment for defendants where the plaintiff in an assault case, although having stated in his counteraffidavit that unnecessary force was used, nevertheless had stated in a previous deposition that no force was used; refusing to find that a triable issue was thus presented, the court said: 'Where, as here,

however, there is a clear and unequivocal admission by the plaintiff, himself, in his deposition . . . we are forced to conclude there is no *substantial* evidence of the existence of a triable issue of fact.' (242 Cal.App.2d at p. 610.) And in *Newport* v. *City of Los Angeles, supra,* 184 Cal.App.2d 229 [7 Cal.Rptr. 497], the sufficiency of the moving party's affidavit was challenged on the basis, inter alia, of the rule requiring that only facts within the personal knowledge of the moving party, as to which he could give competent testimony at trial, be given effect when considering the sufficiency of his affidavits. Affirming the summary judgment, the court held that the affidavit was sufficient where the moving party incorporated therein verified admissions of the opposing party concerning which he, the moving party, could claim neither personal knowledge nor competency to testify. (184 Cal.App.2d at p. 236; see also *Rader* v. *Thrasher* (1972) 22 Cal.App.3d 883, 889-890 [99 Cal.Rptr. 670].)

"The reasons for this attitude toward the legitimate products of discovery are clear. As the law recognizes in other contexts (see Evid. Code, §§ 1220-1230) admissions against interest have a very high credibility value. This is especially true when, as in this case, the admission is obtained not in the normal course of human activities and affairs but in the context of an established pretrial procedure whose purpose is to elicit facts. Accordingly, when such an admission becomes relevant to the determination, on motion for summary judgment, of whether or not there exist triable issues of *fact* (as opposed to legal issues) between the parties, it is entitled to and should receive a kind of deference not normally accorded evidentiary allegations in affidavits. (See generally Bauman, *California Summary Judgment: A Search For a Standard* (1963) 10 U.C.L.A. L.Rev. 347, especially pp. 350-351, 357-360.)" ■ The rule stated in *D'Amico* is that the assertion of facts contradictory to deposition testimony by affidavit does not constitute " '*substantial* evidence of the existence of a triable issue of fact' " for the purpose of denying a motion for summary judgment. A fortiori, trial testimony simply contradicting a clear and unequivocal admission in a deposition cannot require denial of a nonsuit.

In two cases subsequent to *D'Amico*, the same result has been reached. In *Leasman* v. *Beech Aircraft Corp.*, 48 Cal.App.3d 376 [121 Cal.Rptr. 768], a summary judgment for defendant was affirmed. The plaintiff had made admissions in her deposition and in answers to interrogatories that she had suffered no physical injury. In opposition to a motion for summary judgment, she filed a counterdeclaration stating that "as '. . . a

direct consequence of the disturbance and severe shock I received on May 10, 1970, I have suffered headaches more severe than any I have ever known. My arms and hands ache at times, and on occasions, my back stiffens up preventing sleep. . . .' " (*Id.*, at p. 380.) Based upon the decision in *D'Amico,* the *Leasman* court held that plaintiff's counteraffidavit did not show that a genuine issue of fact existed, stating: "[T]he credibility of the admissions are [*sic*] valued so highly that the controverting affidavits may be disregarded as irrelevant, inadmissible or evasive. . . ." (48 Cal.App.3d at p. 382.)

Most recently, in *Gray* v. *Reeves,* 76 Cal.App.3d 567 [142 Cal.Rptr. 716], a summary judgment in favor of defendant was affirmed. In this case, instead of filing a counterdeclaration contradicting unequivocal admissions in his deposition, the plaintiff simply changed the answers in the deposition to delete the admissions. No attempt was made to explain the changes. The court cited the above authorities, holding that counteraffidavits could not create a triable issue and said (*id.,* at p. 574): "There is no reason to draw a distinction between an attempt to counter an admission by affidavit and an attempt to counter an admission by changing the content of an answer given by a party directly in the deposition, especially *where there is no assertion the original answer was incorrectly transcribed or the question was misleading or ambiguous.* In both the changed affidavit and changed deposition cases the credibility of the parties is held up for examination by the contradicting statements, the first of which constitutes a reliable admission against interest. The trial court may accept the first and reject the later of these contrary positions. This choice is particularly called for where, as here, the deponent waits 19 months to make the changes and is then inspired to make the changes by pressures attending an apparently grantable motion for summary judgment." (Italics added.)

The foregoing authorities are consistent with the doctrine of informal judicial admissions as applied in numerous other jurisdictions. ". . . It has commonly been held that if a party testifies deliberately to a concrete fact, not as a matter of opinion, estimate, appearance, inference, or uncertain memory, but as a considered circumstance of the case, his adversary is entitled to hold him to it as an informal judicial admission, at least insofar as the fact is peculiarly within his own knowledge. . . . [Fns. omitted.]" (30 Am.Jur.2d (1967) Evidence, § 1087, p. 241.)

In *Bell* v. *Kuykendall Investment Company* (Tex.Civ.App. 1964) 379 S.W.2d 381, 385, the court stated the Texas rule as follows:

". . . We think the foregoing brings defendant, Bell, within the rule announced by this court in J. R. Watkins v. King, Tex.Civ.App., 83 S.W.2d 405, wherein we find the following pronouncement: 'When a party testifies to positive and definite facts which, if true, would defeat his right to recover or conclusively show his liability, and such statements are not subsequently modified or explained by him so as to show that he was mistaken, although testifying in good faith, it has generally been held that he is conclusively bound by his own testimony and cannot successfully complain if he is nonsuited or the court directs a verdict against him.' Points (2, 3); citing many cases.

"Our Supreme Court reaffirmed this doctrine in Stanolind Oil & Gas Co. v. State, 136 Tex. 5, 145 S.W.2d 569, point 1, (citing many cases), and has not seen fit to change it. . . ."

We conclude on the basis of the foregoing authorities that there was no substantial evidence supporting plaintiff's claim that he was directed to park on the east side of Vineland and that the only finding that a reasonable trier of fact could make in that respect was that it was plaintiff's own decision for his own convenience to park in that location. Such being the case, there was nothing left upon which to base plaintiff's claim of duty except the facts that plaintiff was called upon to remain somewhere in the vicinity of the original accident to sign off on an inventory report, and that two of the officers present were aware of the fact that he had parked on the east side of Vineland.

These facts did not give rise to a special relationship sufficient to impose a duty upon the officers to place flares warning northbound traffic on Vineland. In the first place, there was no evidence that the officers realized or should have realized that flares were required for plaintiff's protection. The width of the outside lane on Vineland (24 feet) was such that a parked vehicle did not interfere with the free passage of traffic. The tow truck was fully equipped with emergency vehicle lighting devices patently adequate to make its presence obvious to oncoming motorists whose view was not obstructed; the flashing yellow emergency signal had been in operation since plaintiff's arrival at the accident scene. If there was a "blind" spot south of the railroad tracks from which motorists could not see the parked tow truck until they reached a point some 400 feet away, it was not shown that the officers were aware of this circumstance. Nor was there any evidence that the officers knew plaintiff was working outside the truck on the traffic side. Thus no need to warn motorists to give the parked vehicles a wide berth was apparent.

Both parties place reliance upon the decision of this division in *Mann v. State of California, supra,* 70 Cal.App.3d 773, where we reversed a directed verdict for defendant State of California. Mann, the plaintiff, had been injured when struck by an 81-year-old driver, blind in his right eye. Plaintiff was standing in the speed change lane of a freeway between stalled cars. A Highway Patrol officer had investigated the stalled vehicles. In so doing, he parked his vehicle with its rearward flashing lights behind the stalled vehicles, and he stood in the speed change lane talking with the occupants of the stalled cars and plaintiff. Then the officer left to resume normal patrol, without advising those present that he was leaving, thereby withdrawing the protection of the flashing lights and leaving the stalled vehicles and pedestrians without any protective devices. In finding that there was evidence upon which a breach of duty could be found, we noted that the plaintiff and the other pedestrians were clearly in a position of dependence upon the officer. We said in this respect as follows (*id.,* at p. 780):

"Clearly plaintiff was dependent upon Officer Lane here. Officer Lane was the expert in traffic safety and charged with specific responsibility for it on the stretch of freeway in question. (Cf. Comment, *Municipality Liable for Negligent Failure to Protect Informer: The Schuster Case* (1959) 59 Colum. L.Rev. 487, 502.) Once, having apprised himself of the dangerous position of the stranded motorists and those about them, such as plaintiff, he had a duty to exercise ordinary care to protect these people from traffic dangers at least to the extent of the already-mentioned readily available means of doing so.[6] While no special relationship may exist between members of the California Highway Patrol and the motoring public generally, or between the Patrol and stranded motorists generally, once a state traffic officer has chosen to investigate the plight of specific persons on a freeway and informed himself of the foreseeable danger to them from passing traffic, a special

---

"[6]This result of possible liability on the part of the state can be reached by a somewhat different route. In *Hartzler v. City of San Jose, supra,* 46 Cal.App.3d at page 10 [120 Cal.Rptr. 5], the court spoke as follows: 'The common theme running through these decisions is the voluntary assumption by the public entity or official of a duty toward the injured party. Even though there is initially no liability on the part of the government for its acts or omissions, once it undertakes action on behalf of a member of the public, and thereby induces that individual's reliance, it is then held to the same standard of care as a private person or organization.'

"This is essentially an estoppel theory of liability and one which we regard as unnecessary in view of the already indicated language of Government Code section 815.2. In other words, in our view, possible liability is much the same in a situation of this kind, regardless of whether the defendant is a public entity or someone from the private sector."

relationship requiring him to protect them by readily available means arises and liability may attach if the officer's limited duty to protect these people under these special circumstances is not performed. Stated otherwise, the foreseeable risk of harm to those people may have been unreasonable and, if so, Officer Lane, as a state traffic officer who had acquainted himself with their plight, had a duty to exercise ordinary care to protect them from such risk. (See *Hergenrether* v. *East,* 61 Cal.2d 440, 445 [39 Cal.Rptr. 4, 393 P.2d 164].)"

It is apparent that the basis upon which a special relationship v.as found in *Mann* has no application to the case at bench. The officers in this case had not "chosen to investigate the plight of specific persons" and informed themselves "of the foreseeable danger to them from passing traffic." The defendant officers in this case did not involve themselves at all in plaintiff's status vis-à-vis traffic passing the place where plaintiff chose to park on the east side of Vineland. Nor did the officers withdraw an existing protection which had been furnished by them, as did the officer in *Mann.* Plaintiff here was simply left to his own devices which were more than adequate to cope with any foreseeable hazard. It is thus clear that there was no substantial evidence of the existence of any special relationship of dependency on the basis as stated in *Mann.*

Plaintiff's attempt to show a breach of duty based upon the provisions of Vehicle Code section 25300 misconstrues the meaning of that section. It applies only to vehicles that exceed 80″ in width which are disabled. There was no evidence that the vehicle being towed in this case exceeded that width and the tow truck was not disabled. No requirement for the placing of the warning devices specified by section 25300 was applicable. The applicable section was Vehicle Code section 25253, which provides as follows: "Tow cars used to tow disabled vehicles shall be equipped with flashing amber warning lamps which shall be displayed as may be deemed advisable to warn approaching drivers during the period of preparation at the location from which a disabled vehicle is to be towed. A flashing amber warning lamp upon a tow car may be displayed to the rear when such tow car is towing a vehicle and moving at a speed slower than the normal flow of traffic." Clearly, plaintiff's injury occurred "during the period of preparation." Consequently, the employment of the flashing amber warning lamp was full compliance with the requirement of the Vehicle Code.

The trial court correctly concluded that there was no substantial evidence of the violation of any duty to plaintiff. The judgment of nonsuit was therefore correctly granted. (*O'Keefe* v. *South End Rowing Club, supra,* 64 Cal.2d at p. 746.) Such being the case there is no need to discuss the other contentions of the parties.

The judgment is affirmed.

Cobey, Acting P. J., and Allport, J., concurred.

A petition for a rehearing was denied April 26, 1978, and the petitions of all the appellants for a hearing by the Supreme Court were denied May 25, 1978. Bird, C. J., and Mosk, J., were of the opinion that the petitions should be granted.