[Civ. No. 18887. Third Dist. May 28, 1981.]

HENDERSON BROTHERS STORES, INC., et al., Plaintiffs and Appellants, v.
CHARLES R. SMILEY et al., Defendants and Respondents.

COUNSEL

Cole & Cole and Robert M. Cole for Plaintiffs and Appellants.

Memering & DeMers, Suzanne M. Trimble, Betty Wolfe, Hardy, Erich & Brown, Cavan Hardy, David S. Worthington, Dayton Van Longyear Low, Ball & Lynch, and Joyce Cram for Defendants and Respondents.

OPINION

BLEASE, J.—Plaintiffs, Henderson Brothers Stores, Inc., William D. and Patricia Henderson, and Jobbers Service, Inc., appeal from judgments of nonsuit entered against them in favor of defendants, L. A. MacDonald (doing business as Sacramento Wheel Service, Inc.) and Welsh & Bresee of Sacramento, Inc., and the consequent dismissal of their cause of action against defendant Charles R. Smiley (doing business as C. R. Smiley & Sons) on the ground of mootness.

This action arose from an incident which occurred on December 18, 1971. On that date Smiley, a licensed roofing contractor, was engaged in reroofing MacDonald's building with asphalt, which must be heated to melting in a large "tar kettle" before it can be applied. Smiley had such a tar kettle, which he had recently purchased from Welsh & Bresee, stationed in a passageway between MacDonald's building and a warehouse belonging to the Hendersons when the kettle erupted suddenly, spewing flames 10 to 20 feet into the air and set fire to the Hendersons' building.

At the conclusion of plaintiffs' case, after nine days of trial, MacDonald and Welsh & Bresee moved for judgments of nonsuit, which were granted. Since plaintiffs and Smiley had already reached a settlement and the issue of Smiley's liability was important only insofar as it affected that of the other defendants (Smiley remained a defendant

under the peculiar terms of the settlement, which provided for payment of $25,000 by his insurers regardless of how the issue of liability was decided), the cause of action against him was dismissed as moot.

Plaintiffs advance numerous contentions of reversible error in their 247-page opening brief. We are compelled to agree with them that the trial court erred in keeping from the jury the issue of whether the "hot roofing" operation performed by Smiley at the instance of MacDonald involved a "special danger [of fire] inherent in the work," which might form the basis for liability on the part of MacDonald. Accordingly, we reverse the judgment of nonsuit as to MacDonald, as well as the dismissal of the cause of action against Smiley. We affirm the judgment of nonsuit as to Welsh & Bresee.

I

The judgment of nonsuit in favor of MacDonald comprehended all three theories of liability advanced by plaintiffs against him: (1) negligent selection of an independent contractor;[1] (2) nuisance;[2] and (3) "nondelegable duty." In the course of the discussion between the court and counsel regarding MacDonald's motion, plaintiffs asked that they be permitted to amend their complaint to allege, in place of a "nondele-

---

[1] A cause of action lies in tort for the negligent selection of an independent contractor. (*Holman v. State of California* (1975) 53 Cal.App.3d 317, 336 [124 Cal.Rptr. 773]; Rest.2d, Torts, § 411; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 658, p. 2938.) The trial court found, however, that no substantial evidence of such negligence had been adduced. The court pointed out that MacDonald knew Smiley was a licensed contractor who had been in business many years, had employed him three to four times a year for a period of about four years on minor repair jobs which were accomplished satisfactorily, and was in possession of no information which reflected badly on Smiley's competence. Moreover, if MacDonald had asked Smiley specifically about his experience in "hot-roofing" work and familiarity with tar kettles, the evidence indicated that Smiley would have given him complete reassurances. Finally, there was no showing that if MacDonald had contacted banks regarding Smiley's financial responsibility, or previous employers regarding his competence, he would have found Smiley "anything less than qualified."

[2] The employer of an independent contractor may be held liable in nuisance for injury resulting from the contractor's activities. (*Snow v. Marian Realty Co.* (1931) 212 Cal. 622, 624-626 [299 P. 720].) The trial court found, however, that no evidence had been adduced to show that MacDonald knew or should have known of Smiley's negligence in the handling of the tar kettle, which created the nuisance. (See *Snow v. Marian Realty Co., supra,* at p. 625 [employer was "fully aware of the consequences of [its] acts"]; *Spence v. Schultz* (1894) 103 Cal. 208, 212 [37 P. 220]; *Wile v. Los Angeles Ice etc. Co.* (1905) 2 Cal.App. 190, 192 [83 P. 271]; *Sawaya v. DeCou* (1943) 60 Cal.App.2d 146, 150-151 [140 P.2d 98]; Rest.2d Torts § 427B.)

gable duty," that there existed a "special danger inherent in the work" done by Smiley. The court decided that the former, more general theory embraced the latter, but nonetheless granted the nonsuit. As to this last theory, the court found that "there was no evidence to go to the jury, ... that use of a tar kettle had such a special danger or danger inherent to its normal operation so as to require special precautions by the operator. [¶] It appears to the Court that the only evidence we had was if you operate those things normally you may get a flash. [¶] They are easily controlled, and it's only when you have the intervening negligence of the operator, or a defect or some other matter, that you have the risk of danger that we had in this particular case." We think the court erred in this determination.

■ "[I]t has long been said to be the general rule that there is no vicarious liability upon the employer [for the torts of an independent contractor].... [¶] ... American courts ... have continued to repeat the 'general rule' of non-liability with exceptions, whose very number is sufficient to cast doubt upon the validity of the rule." (Prosser, Handbook of the Law of Torts (4th ed. 1971) p. 468.) These exceptions are "of such wide scope that they leave only a small area in which the so-called general rule operates. (See Rest.2d, Torts § 410 et seq.; 32 Cal.L.Rev. 196; 44 Cal.L.Rev. 762; 9 Stanf. L.Rev. 690; ... Accordingly it seems proper to say that nonliability is now the exception; i.e., the so-called general rule is followed only where no good reason is found for departing from it. And considerations of policy frequently call for such departure: 'Some of the principal ones are that the enterprise, notwithstanding the employment of the independent contractor, remains the employer's because he is the party primarily to be benefited by it, that he selects the contractor, is free to insist upon one who is financially responsible, and to demand indemnity from him, that the insurance necessary to distribute the risk is properly a cost of the employer's business, and that the performance of the duty of care is of great importance to the public.' (*Van Arsdale* v. *Hollinger* (1968) 68 [Cal.]2d 245, 253 ....)" (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 657, p. 2937.)

A well-recognized exception to the general rule of nonliability applies where the contractor is engaged in the performance of "inherently dangerous" work. (Prosser, *supra*, at pp. 472-474; 4 Witkin, *supra*, Torts, §§ 661, 662, pp. 2939-2942.) This exception is most often called the "peculiar risk" doctrine in California, after the language used in sec-

tions 413 and 416 of the Restatement Second of Torts.[3] Section 413 imposes direct liability on the employer for failing to provide in the agreement with the contractor for the taking of appropriate precautions: "One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the absence of such precautions if the employer [¶] (a) fails to provide in the contract that the contractor shall take such precautions, or [¶] (b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions." Where such a risk exists, section 416 imposes vicarious responsibility on the employer, regardless of any contractual provision, for the contractor's negligent failure to take the proper special precautions: "'One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has

---

[3]"Examples of work which has been held to create peculiar risk of physical harm absent special precautions are: The danger of being struck by a wall being knocked down on a demolition job (*Aceves v. Regal Pale Brewing Co.*, [(1979) 24 Cal.3d 502 [156 Cal.Rptr. 41, 595 P.2d 619]]; the risk of a cave-in while working in a nine-foot deep unshored and unsloped trench (*Griesel v. Dart Industries, Inc.* (1979) 23 Cal.3d 578 [153 Cal.Rptr. 213, 591 P.2d 503]; see also *Widman v. Rossmoor Sanitation, Inc.* (1971) 19 Cal.App.3d 734 [97 Cal.Rptr. 52]); eradicating white line markings on the street with the risk a motorist would injure a workman (*Van Arsdale v. Hollinger* (1968) 68 Cal.2d 245 [66 Cal.Rptr. 20, 437 P.2d 508]); repairing a metal tank from the inside by forcing buckled metal outward with the risk that the metal would spring inward and injure a workman (*Ferrel v. Safway Steel Scaffolds* (1962) 57 Cal.2d 651 [21 Cal.Rptr. 575, 371 P.2d 311]); painting the inside of a tank with the risk of an explosion because of inadequate ventilation (*Woolen v. Aerojet General Corp.* (1962) 57 Cal.2d 407 [20 Cal.Rptr. 12, 369 P.2d 708]; see also *McDonald v. City of Oakland* (1965) 233 Cal.App.2d 672 [43 Cal.Rptr. 799]); cement work on a bridge 20 feet high with no scaffolding or railing—worker fell from bridge (*Fonseca v. County of Orange* (1972) 28 Cal.App.3d 361 [104 Cal.Rptr. 566]); erecting and cross-girdering 30-foot steel column for a water tower without safety equipment to keep plaintiff from falling off tower (*Stilson v. Moulton-Niguel Water Dist.* (1971) 21 Cal.App.3d 928 [98 Cal. Rptr. 914]); building bridge over high voltage wires—worker injured when boom of crane touched wire (*Walker v. Capistrano Saddle Club* (1970) 12 Cal.App.3d 894 [90 Cal.Rptr. 912]); building concrete wall and floor without railings to a height of 10 feet with the risk that a workman might fall or be pushed from the wall (*Morehouse v. Taubman Co.* (1970) 5 Cal.App.3d 548 [85 Cal.Rptr. 308]); backing a loaded truck on a construction project without a warning device with the risk that worker might be run down (*Anderson v. L. C. Smith Constr. Co.* (1969) 276 Cal.App.2d 436 [81 Cal.Rptr. 73])." (*Stark v. Weeks Real Estate* (1979) 94 Cal.App.3d 965, 970-971 [156 Cal. Rptr. 701].)

provided for such precautions in the contract or otherwise.'" (See *Aceves* v. *Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 508-509 [156 Cal.Rptr. 41, 595 P.2d 619].) Section 427 of the Restatement Second states the same rule in somewhat different form,[4] referring to a "special danger . . . inherent in or normal to the work, . . .": "One who employs an independent contractor to do work involving a special danger to others which the employer knows or had reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger."

■■ ■■■ The comment of the trial court in granting a nonsuit on the "inherent danger" theory that, while plaintiffs had established that tar kettles "normally" might flash, they were not shown to present a significant fire hazard in the absence of "intervening negligence of the operator" or a like contributing cause, suggests a misapprehension of the scope of the doctrine.[5] ■ Despite its expression in

---

[4]Comment a to section 416 of the Restatement Second explains: "There is a close relation between the rule stated in this Section, and that stated in § 427, as to dangers inherent in or normal to the work. The two rules represent different forms of statement of the same general rule, that the employer remains liable for injuries resulting from dangers which he should contemplate at the time that he enters into the contract, and cannot shift to the contractor the responsibility for such dangers, or for taking precautions against them. The rules stated in the two Sections have been applied more or less interchangeably in the same types of cases, and frequently have been stated in the same opinion as the same rule, or as different phases of the same rule. The rule stated in this Section is more commonly stated and applied where the employer should anticipate the need for some specific precaution, such as a railing around an excavation in the sidewalk. The rule stated in § 427 is more commonly applied where the danger involved in the work calls for a number of precautions, or involves a number of possible hazards, as in the case of blasting, or painting carried on upon a scaffold above the highway." (See also Prosser, Handbook of the Law of Torts (4th ed. 1971) p. 472.)

[5]We note, moreover, that at the same time it permitted plaintiffs to assert the "inherent danger" theory as one encompassed by the pled "nondelegable duty," the court refused to permit them to reassert the "peculiar risk" doctrine, as to which a special demurrer had been sustained, for the stated reason that it viewed the earlier ruling as establishing "the law of the case." The rule of liability expressed by the "inherent danger" and "peculiar risk" doctrine has been characterized as imposing a species of "nondelegable duty." (*Maloney* v. *Rath* (1968) 69 Cal.2d 442, 447 [71 Cal.Rptr. 897, 445 P.2d 513, 40 A.L.R.3d 1]; *Stilson* v. *Moulton-Niguel Water Dist.* (1971) 21 Cal. App.3d 928, 938 [98 Cal.Rptr. 914].) The demurrer as to the "peculiar risk" theory was sustained on the ground that the doctrine is limited to actions for personal injury. We think the ruling was erroneous. Sections 413 and 416 of the original Restatement of Torts did limit the doctrine to cases of "bodily harm to others," but the Restatement Second imposes liability for "*physical* harm to others." (Italics added.) Section 7 of the Restatement Second explains that ". . . [t]he words 'physical harm' are used throughout the Restatement of this subject to denote the physical impairment of the human

terms of "inherent" danger, "[i]t is not ... necessary to the employer's liability that the work be of a kind which cannot be done without a risk of harm to others ...." (Rest.2d § 427, com. b.) Indeed, application of the rule is predicated on the negligent failure of either the employer or the contractor to take appropriate special precautions. It is true that liability under the "inherent danger" doctrine does not extend to negligence of the contractor which "creates a new risk, not inherent in the work itself or in the ordinary and prescribed way of doing it, and not reasonably to be contemplated by the employer" (Rest.2d, § 427, com. d), or to so-called "collateral" negligence, "negligence which is unusual or abnormal, or foreign to the normal or contemplated risks of doing the work, as distinguished from negligence which creates only the normal or contemplated risk" (Rest.2d § 426, com. a), but the trial court gave no hint that its reference to "intervening" negligence was so limited.

■ If it was so limited, that is, if the court's remark be understood to mean that there was no evidence in the record to show that the operation of tar kettles presents a substantial fire hazard except where there is "collateral negligence," then we must reject the court's characterization of the evidence.[6] ■ "'[A] nonsuit may be granted "... 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were

---

body, or of land or chattels." The Supreme Court has observed without qualification that sections 413 and 416 of the Restatement Second state "[t]he applicable law on the peculiar risk doctrine." (*Aceves v. Regal Pale Brewing Co., supra,* 24 Cal.3d 502, 508; see also *Van Arsdale v. Hollinger* (1968) 68 Cal.2d 245, 253-254 [66 Cal.Rptr. 20, 437 P.2d 508] [noting difference in language between § 416 in the original Restatement and in the Restatement Second].) Moreover, in another context, strict products liability in tort, the court extended the doctrine to govern physical injury to property, observing, "Physical injury to property is so akin to personal injury that there is no reason to distinguish them." (*Seeley v. White Motor Co.* (1965) 63 Cal.2d 9, 19 [45 Cal.Rptr. 17, 403 P.2d 145].) In sum, though our research has failed to turn up any reported California cases in which the doctrine was invoked to impose liability for damage to property, we can discern no reason for restricting it to cases of bodily injury. The sustaining of the demurrer on this ground would itself have been reversible error except for the trial court's seemingly inexplicable decision to permit plaintiffs to assert the "inherent danger" doctrine, which is, as we have already observed, merely a different formulation of the same rule.

[6]We note that, in considering the motion of Welsh & Bresee, the court observed: "Everyone's testified a tar kettle can be dangerous. They are hot, they can flash, they can cause fires. These are things that can happen."

given.'"'" *McDonald* v. *City of Oakland* (1965) 233 Cal.App.2d 672, 674 [43 Cal.Rptr. 799], quoting from *Meyer* v. *Blackman* (1963) 59 Cal.2d 668, 671 [31 Cal.Rptr. 36, 381 P.2d 916].) ▇▇ Examining the record in this light, we must conclude that more than substantial evidence was adduced that, in the absence of special precautions, the normal operation of tar kettles in roofing work presents a significant, recognizable danger of fire.

As the trial court observed, there was abundant testimony (by Smiley, employees of Welsh & Bresee, an officer of the manufacturer, and one of plaintiffs' expert witnesses, a former contractor and roofing specialist for the State Board of Architecture) that "flashes" are common and unavoidable in the operation of tar kettles. As asphalt is heated above 300 degrees fahrenheit in the kettle, volatile vapors are given off, which will create an explosive mixture if the asphalt is heated to a temperature of 550 to 600 degrees. If the temperature reaches 620 degrees, the so-called "auto-ignition point," the molten asphalt itself can ignite the vapors. Below that temperature, the heating tubes in the kettle, which have a surface temperature of 900 to 1,500 degrees, can be the source of ignition if the level of molten asphalt is permitted to get so low as to expose them. Thus "flashes" can result from overheating or allowing the level of asphalt to be drawn down too low. Permitting carbon to build up in the kettle is also hazardous, since it can insulate the temperature and thus bring about overheating and can sustain a fire if combustion results. As the trial court observed, they can usually be smothered immediately by closing the lid. However, a Welsh & Bresee employee conceded that letting the asphalt get low is "[v]ery dangerous." An officer of the manufacturer did testify that when the level of asphalt is six to eight inches from the top of the kettle, as it should be, a flash might "blow the lid open, . . . and scare[] the heck out of the operator," but would not pose a real danger of fire, but this was in explanation of his conclusion that the asphalt had been drawn below that level so that the heating tubes were exposed, which explanation he implicitly considered consistent with "the kind of explosion that was described." Another expert, a professor of civil engineering and consultant to state and federal occupational safety and health agencies, agreed with him that the evidence indicated that the level was too low and that this was the likely cause of the fire. He noted that a tar kettle "during an explosion can be a tremendous flamethrower." A deputy fire marshal testified that he had been to "many" tar kettle fires. He also testified that the thermostat on the kettle was found set at 550 degrees, which was too high according to one of plaintiffs' experts (about 450

degrees being a proper setting). There was also testimony that an examination of the kettle after the fire indicated that a good deal of carbon had been permitted to build up. To sum up, there was testimony that the hazards of overheating asphalt, drawing it too low and allowing carbon deposits to build up in the kettle were generally known to roofers. Finally and significantly, MacDonald admitted that he "knew before the fire" that the use of hot tar and a tar kettle presented a fire hazard.

That the operation of a tar kettle might involve a substantial, recognizable risk of fire certainly was established; it was admitted by MacDonald. Although the limits of an employer's liability for a contractor's negligence are ill-defined and "elusive" (*LaCount v. Hensel Phelps Constr. Co.* (1978) 79 Cal.App.3d 754, 765 [145 Cal.Rptr. 244]), we are confident that the negligence of Smiley, of which there is substantial evidence in the record (setting the thermostat too high, letting the level of asphalt go down too low and permitting a dangerous accumulation of carbon to build up in his kettle), amounted to the kind of failure to take special precautions against a risk for which an employer is held responsible.

■ Comment b to section 413 of the Restatement Second conveys an idea of the limits of the range of negligent conduct to which the "peculiar risk" doctrine applies: "It is obvious that an employer of an independent contractor may always anticipate that if the contractor is in any way negligent toward third persons, some harm to such persons may result. Thus one who hires a trucker to transport his goods must, as a reasonable man, always realize that if the truck is driven at an excessive speed, or with defective brakes, some collision or other harm to persons on the highway is likely to occur. This Section has no reference to such a general anticipation of the possibility that the contractor may in some way be negligent. It is not concerned with the taking of routine precautions, of a kind which any careful contractor could reasonably be expected to take, against all of the ordinary and customary dangers which may arise in the course of the contemplated work. Such precautions are the responsibility of the contractor; and if the employer has exercised reasonable care to employ a contractor who is competent and careful ... he is not required to provide, in the contract or otherwise, that the contractor shall take them.

"This Section is concerned with special risks, peculiar to the work to be done, and arising out of its character, or out of the place where it is

to be done, against which a reasonable man would recognize the necessity of taking special precautions. The situation is one in which a risk is created which is not a normal, routine matter of customary human activity, such as driving an automobile, but is rather a special danger to those in the vicinity, arising out of the particular situation created, and calling for special precautions. 'Peculiar' does not mean that the risk must be one which is abnormal to the type of work done, or that it must be an abnormally great risk. It has reference only to a special, recognizable danger arising out of the work itself."

■ Courts have taken varying approaches to deciding what dangers are "special" and "recognizable," from which we distill four factors which are recognized as important determinants of the dangers' character: (1) the foreseeability of the specific risk or set of risks arising in connection with the work as planned (see *Anderson* v. *Chancellor Western Oil Dev. Corp.* (1975) 53 Cal.App.3d 235, 240 [125 Cal.Rptr. 640], ["[T]he peculiar risk must be one which can be foreseen as a direct consequence of the work being done."]; *Elder* v. *Pacific Tel. & Tel. Co.* (1977) 66 Cal.App.3d 650, 659 [136 Cal.Rptr. 203] [no liability because plaintiff workman "departed in several respects from the plan"]; *Castro* v. *State of California* (1981) 114 Cal.App.3d 502, 503, 515-516 [170 Cal.Rptr. 734] [plaintiff struck by truck approaching construction site in reverse, according to "the approved plan of operation"]); (2) whether the risk is "intimately connected with the work" or "accidental" (see *Snyder* v. *Southern Cal. Edison Co.* (1955) 44 Cal.2d 793, 801 [285 P.2d 912], quoted in *LaCount* v. *Hensel Phelps Constr. Co., supra,* 79 Cal.App.3d at p. 765 [use of a crane to lift girders and ballasts weighing from 8 to 100 tons might present peculiar risk or inherent danger]; *Stark* v. *Weeks Real Estate* (1979) 94 Cal.App.3d 965, 972 [156 Cal.Rptr. 701] [peculiar risk doctrine does not apply to "operative details of the work" such as misuse of hand tools: "These are ordinary and customary risks apart from the nature of the work itself. It is obvious that every owner who employs an independent contractor can anticipate that employees of the independent contractor may misuse customary hand tools, thus endangering themselves and third parties. Such a risk is always present. There is nothing peculiar or special about it. On the contrary it is a usual, common and anticipatable danger in the routine performance of the work, against which the owner is not required to take special precautions."]; *Holman* v. *State of California* (1975) 53 Cal.App.3d 317, 330-331 [124 Cal.Rptr. 773] [employer not responsible for safety defect in tractor, which is a "risk apart from the work itself"]; *Addison* v. *Susanville Lumber, Inc.* (1975) 47 Cal.App.3d

394, 402 [120 Cal.Rptr. 737] [hiring of incompetent tree faller]; (3) the degree of risk (see *West* v. *Guy F. Atkinson Constr. Co.* (1967) 251 Cal.App.2d 296, 299 [59 Cal.Rptr. 286], quoting Prosser, Handbook of the Law of Torts (3d ed. 1964) p. 486; *id.*, (4th ed. 1971) p. 473) ["[T]he principle ... seems to be limited to work in which there is a high degree of risk in relation to the particular surroundings, or some rather specific risk or set of risks to those in the vicinity, *recognizable in advance* as calling for definite precautions. The emphasis is upon the "peculiar" character of the risk, and *the need for special, unusual care.*"]; and (4) the possibility of anticipating and prescribing definite precautions to avert the anticipated risk or risks (see *Addison* v. *Susanville Lumber, Inc., supra,* 47 Cal.App.3d at p. 402 ["special danger" presented by falling trees "to those in the vicinity (including tree fallers), ..." did not make owner of land liable since "it is hard to conceive of any special precautions one could take in a rural forest area to eliminate such a risk."].)

█ In the instant case, there was substantial evidence that the risk of fire presented by inadequately tended tar kettles was anticipated by both the contractor and the employer, that use of the tar kettle was indispensable to the job of roofing MacDonald's building with hot tar, that the risk was apparently great (since asphalt vapors are very volatile and there have been "many" tar kettle-caused fires in the past) and, finally, that it was commonly known by roofers that the hazard could be avoided by heating the asphalt to a temperature no higher than 450 degrees, keeping the kettle reasonably full and cleaning the kettle occasionally. The court erred in refusing to permit the issue of Mac-Donald's liability on the theory of "special danger inherent in the work" to go to the jury.[7]

---

[7] In view of our holding requiring that this case be retried, we need not consider plaintiffs' alternative contention, argued at exhausting length in their briefs, that the judgment as to MacDonald should be reversed on the ground that the evidence established the factual basis for imposing strict liability, despite plaintiffs' failure to assert that theory before the trial court. (A special demurrer was sustained as to their attempt to assert the "ultrahazardous" nature of "hot roofing" work. Plaintiffs did not attempt to amend the pleading, but instead abandoned it, despite the fact that the order reflects that the demurrer was sustained *without prejudice* "both on the grounds of uncertainty, and upon the ground of failure to state a cause of action, *as presently phrased*, for strict or absolute liability based upon involvement in an ultrahazardous activity." (Italics added.) Although plaintiffs' attorney now asserts that according to his recollection the demurrer was orally sustained *with* prejudice, the court expressing the view that there was no basis at all for asserting this theory, we cannot credit his unsworn assertions, made at this late date, against the clear mandate of the ruling.) Plaintiffs characterize the operation of a tar kettle as an "abnormally dangerous activity," relying

## II

Plaintiffs contend that the trial court erred in granting Welsh & Bresee's motions for nonsuit on asserted theories of negligent entrustment (Rest.2d Torts, § 390)[8] and negligent failure to warn (Rest.2d Torts, § 388).[9]

---

on the well-established rule imposing strict liability upon activities which create such a serious risk of danger that it is justifiable to place liability for the loss on the person engaging in them, regardless of lack of culpability on his part. (4 Witkin, *supra*, Torts, § 799, p. 3096; *Luthringer v. Moore* (1948) 31 Cal.2d 489, 496-500 [190 P.2d 1] [adopting the rule of the Rest., Torts, §§ 519-523 ("ultrahazardous" activities)]; Rest.2d Torts, §§ 427 [liability of employer of an independent contractor for "abnormally dangerous activity"], 519, 520 ["In determining whether an activity is abnormally dangerous, the following factors are to be considered: [¶] (a) existence of a high degree of risk of some harm to the person, land, or chattels of others; [¶] (b) likelihood that the harm that results from it will be great; [¶] (c) inability to eliminate the risk by the exercise of reasonable care; [¶] (d) extent to which the activity is not a matter of common usage; [¶] (e) inappropriateness of the activity to the place where it is carried on; and [¶] (f) extent to which its value to the community is outweighed by its dangerous attributes.].) Plaintiffs also suggest that *Green v. General Petroleum Corp.* (1928) 205 Cal. 328 [270 P. 952, 60 A.L.R. 475] establishes a somewhat broader basis for imposing strict liability. In that case, the court imposed strict liability on the operator of an oil well which "blew out" and did damage to plaintiffs' adjoining land, observing, "Where one, in the conduct and maintenance of an enterprise lawful and proper in itself, deliberately does an act under known conditions, and, with knowledge that injury may result to another, proceeds, and injury is done to the other as the direct and proximate consequence of the act, however carefully done, the one who does the act and causes the injury should, in all fairness, be required to compensate the other for the damage done.... [In such circumstances,] there is an absolute liability for the consequential damage, regardless of any element of negligence ...." (*Id.*, at pp. 333-334.) Plaintiffs concede that *Green* has come to be interpreted, more narrowly, as a decision imposing strict liability on the basis of an abnormally dangerous activity, but contend its rationale was not so limited. However, the "principle of absolute liability" enunciated in *Green* has been definitively linked by the Supreme Court to the hazardousness of the defendant's activities: "The important factor is that certain activities under certain conditions may be *so hazardous* to the public generally, and of such relative infrequent occurrence, that it may well call for strict liability as the best public policy." (*Luthringer v. Moore, supra*, 31 Cal.2d at p. 500.) Finally, we note that although it is not certain what applicability the principle of the celebrated English case of *Fletcher v. Rylands*, 3 H.L. 330, has in California (*Rozewski v. Simpson* (1937) 9 Cal.2d 515, 520 [71 P.2d 72]), the emphasis in that doctrine on the "escape" of substances and "non-natural" uses of the land has not been followed by California courts in the imposition of strict liability. (4 Witkin, *supra*, Torts, § 799, p. 3096.)

[8]Section 390 of the Restatement Second provides: "One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them."

[9]Section 388 of the Restatement Second provides: "One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom

The court's reasons for granting the motions were similar. As to the theory of negligent entrustment, the court found that the only evidence even arguably supportive of an inference that Welsh & Bresee knew or should have known that Smiley was inexperienced or incompetent was the testimony of a Welsh & Bresee repairman who said Smiley and his brother "weren't too hot" at comprehending his instructions to them in lighting the kettle, so that he had to repeat them. The court found this evidence, in light of Smiley's testimony that he knew how to use a tar kettle and was familiar with the fire hazards involved and how to avoid them, insufficient to support any "reasonable inference [to] satisfy section 390." Plaintiffs alleged a "negligent failure to warn" on the basis that Welsh & Bresee sold a dirty tar kettle to Smiley without warning him about the fire hazard presented by accumulation of carbon in the kettle. The court agreed that there was sufficient evidence to go to the jury that the kettle was dangerous and that no warning was given, but found that no evidence had been adduced to show that Smiley, a licensed contractor, who had owned tar kettles before, was ignorant of the fire hazards presented by dirty tar kettles, or to put Welsh & Bresee on notice that he might be unaware of them.

Since Welsh & Bresee's liability depends on what they knew or should have known at the time the kettle was sold or entrusted to Smiley, we agree with the trial court that the only relevant evidence on that issue is the repairman's testimony. We also agree that Smiley's apparent slowness in comprehending the instructions given him was not evidence of sufficient substantiality to support a verdict in favor of plaintiff. (See *Mikialian* v. *City of Los Angeles* (1978) 79 Cal.App.3d 150, 158 [144 Cal.Rptr. 794].) Although every legitimate inference is drawn from the evidence which can be, to infer from the foregoing evidence that Smiley was ignorant of the fire hazards presented by tar kettles and of the need for appropriate precautions and that Welsh & Bresee had reason to know of his ignorance would be to stretch the rule beyond all reason, in light of the undisputed evidence that Smiley was a licensed roofer with many years of experience, had owned a tar kettle

---

the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier [¶] (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and [¶] (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and [¶] (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous." (See *Morris* v. *Toy Box* (1962) 204 Cal.App.2d 468, 471-473 [22 Cal.Rptr. 572].)

before and was, therefore, aware of the fire hazards presented by tar kettles, and in light of the repairman's explanation that Smiley might be expected to be unfamiliar with the starting up of the kettle he purchased, since it was a larger, more complicated type than he had had before. We conclude that the trial court did not err in granting the nonsuits in favor of Welsh & Bresee.[10]

### III

■ Plaintiffs challenge numerous evidentiary rulings made by the trial court. Since the action against MacDonald will be retried, we need consider the rulings only to determine whether they require reversal of the judgment of nonsuit entered in favor of Welsh & Bresee. With two exceptions, the rulings are entirely unrelated to the determinative issue of whether, at the time they sold or entrusted the kettle to him, Welsh & Bresee had reason to believe Smiley to be incompetent or ignorant of the tar kettle's hazards.

After Smiley testified that he did not remember whether he accompanied his brother to pick up the kettle, plaintiffs' counsel persisted and asked him whether "[t]hinking about it a bit, . . . it would have been more likely" than not that he did. The court properly sustained a defense objection to the question as inviting speculation.

As we have already noted, a Welsh & Bresee repairman testified that he instructed Smiley and his brother in the operation of the tar kettle. The trial court sustained defense objections to certain questions regarding whether he had formed any impression of Smiley's comprehension of the instructions and his experience and competency with tar kettles. As we have also noted, however, the information sought was subsequently permitted to be elicited.

We need not consider the remaining rulings, since they could not have affected the disposition.

---

[10]Plaintiffs also challenge a pretrial grant of partial summary judgment in favor of Welsh & Bresee on an asserted "failure to warn" theory of strict products liability. They have failed, however, to provide an adequate record upon which we may determine the propriety of the court's ruling. We note that, in its motion for summary judgment, Welsh & Bresee urged that it was *undisputed* in the depositions (copies of relevant portions of which are the only reflection in the record of the evidence before the court in making its ruling) that safety instructions were given. We have no basis for rejecting the trial court's determination that no triable issue of fact had been raised.

The judgment of nonsuit in favor of Welsh & Bresee is affirmed. The judgment of nonsuit in favor of MacDonald and the judgment of dismissal in favor of Smiley are reversed.

Regan, Acting P. J., and Evans, J., concurred.

Petitions for a rehearing were denied June 25, 1981, and the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied July 29, 1981.