Flora E. HARDY, Respondent,

v.

ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellant.

No. 51796.

Supreme Court of Missouri, Division No. 2.

Sept. 12, 1966.

Motion for Rehearing or to Transfer to Court En Banc Denied Oct. 10, 1966.

102 South, consisting only of a diesel locomotive and a caboose, collided on a grade crossing. The extra train was traveling south at a speed of approximately 50 miles an hour, en route from Portageville to Hayti. The crossing on which the collision occurred was "three miles and about nineteen and a half poles" south of Portageville. Mr. Hardy, a farm machinery salesman, was alone driving east on a gravel road, about 3:20 in the afternoon on a "light cloudy day." The railroad, four feet above the country road level, is straight and level but intersects the road on an angle and there is a slight incline in the road up to the crossing. The "extreme left front fender" and "all across the front of the truck" and the "extreme front right side * * * along about the steps" of the engine came into collision. The respondent widow submitted her right to recovery by two instructions; one, on the primary negligence hypothesis of failure to ring the bell "and also failed to sound a horn or whistle" eighty rods from the crossing and, two, the humanitarian doctrine hypothesis of "slackening the speed of the train," thereby avoiding the collision. The railroad contends that Mrs. Hardy failed to make a case under either theory and that its motions for a directed verdict should have been sustained and failing in either of these assignments contends that it is entitled to a new trial because of error in Instruction 5 submitting failure to signal.

Ford, Ford & Crow, Kennett, for respondent.

Ward & Reeves, Caruthersville, for appellant, Ernest D. Grinnell, Jr., St. Louis, of counsel.

BARRETT, Commissioner.

In this action a widow, Flora E. Hardy, has been awarded $22,500 for the wrongful death of her husband, Ellett W. Hardy. Mr. Hardy was killed on October 26, 1964, when his one and one-half ton pickup truck and the appellant-railroad's "extra train"

Mary Margaret Mathenia, age 16, and her brother, Benny, age 18, live on the north side of the gravel road just west of the crossing. On October 26, 1964, they, together with younger children, were working in a cotton field across the road from the house. Benny was picking cotton 220 steps from the railroad, 240 "regular steps" from the crossing and Mary Margaret was at the end of a row weighing cotton. They heard or saw the train and immediately important on the problem of whether there was a humanitarian case described the circumstances attending the collision. Mary Margaret first saw the train when it was a half-mile

from the crossing but she was weighing cotton and did not watch continuously. She saw Mr. Hardy pass and saw "the kids" wave at him. She and Benny testified to facts from which it is probably inferable that by reason of some trees there was a place and a period of time in which Mr. Hardy could not see the train as he approached the crossing. Mary Margaret said "there was an open space and there was a dead tree there where the train began to blow its whistle." On photographs, really too small to be impressive, she pointed to the trees and the opening. The engineer said that at the "Whistle Board," a quarter of a mile from the crossing, "there is a tree there * * * which would block your view out for a few feet to see down that road * * *."

But to establish a humanitarian case Mrs. Hardy called as her witness engineer Duncan. A quarter of a mile north of the crossing there was a "Whistle Board" and Duncan said that as he sounded the whistle in accordance with the board the train was traveling at a speed of 50 miles an hour. As indicated, from his point of observation, seated at the throttle, Mr. Duncan was looking ahead and to the right and "three to four pole (a pole is 150 feet) lengths before the crossing" he could see west down the gravel road and at that distance (600 feet) and speed (50 miles an hour) he first saw the pickup truck "a little closer to the crossing than I was" and traveling "I would estimate it somewhere around forty miles an hour and judging from the speed I was going." He said that he did not see the truck prior to that time, that is prior to 600 feet north of the crossing, that he was blowing the whistle and looking ahead but watching the truck and he said "I watched it until the time of the impact." As to the pickup, he said, "Well, when I first noticed him he was slowing down, and I could tell his speed was reduced but I couldn't tell how much, but he looked like he was slowing down. * * * He didn't slow down as much as it seemed like he was slowing down—seem-

ed like his rate of slowdown didn't decrease or it seemed—I mean increase, but seemed like it more or less leveled off after he first slowed down." When Hardy "leveled off" Duncan said, "Oh, I was possibly between one and two pole lengths (300 feet) from the crossing and he was on up nearer to the crossing." But "he just wasn't slowing down as much as I thought he ought to to get stopped and my judgment. * * * Well, he slowed down and he didn't slow down as much as I thought he should be slowing down to get stopped at the crossing * * *." He said that when he first noticed the pickup slowing "it could have been a little nearer than three poles" (450 feet) but, he said that he did not slow down as much as five miles an hour. As to slowing down and leveling off at 35 miles an hour Duncan said, "I would say that it was possible but I wouldn't say that he did because I really couldn't tell how fast he was going." In any event, when the engineer "saw there was a possibility that there might be a collision, and I placed the emergency brake valve in emergency application." It was his estimate that the locomotive was then "between one and two pole lengths from the crossing" and that it was "possibly" one pole length (150 feet) by the time he "got the thing all the way over." Nevertheless the locomotive and the truck collided and at the moment of collision he estimated the speed of the truck at 20 miles an hour and the train "had probably slowed down some but I didn't know how much" between the emergency application and the collision, "I would say at least five miles an hour." Duncan said that from the point of placing the brake in emergency the train stopped in "approximately twelve pole lengths," 1800 feet.

Mrs. Hardy's submission of humanitarian negligence was that "at the moment when Defendant first knew or could have known of such position of immediate danger, Defendant still had enough time so that by using the means available * * * Defend-

ant could have avoided injury to Ellett W. Hardy *by slackening the speed of the train.*" With this hypothesis in mind Mrs. Hardy argues that from the noted testimony, while "niceties in mathematical calculations are often necessitated," a jury case of humanitarian negligence was made. It is not necessary to set forth her argument in full and examine all the inferences, it is sufficient to illustrate. She says there was evidence that the train had slackened its speed at least five miles per hour from its previous speed of 50 miles an hour and that "such slackening was accomplished in a distance of 22.5 to 40 feet." She says that Mr. Hardy's speed at the crossing and on impact was 20 miles an hour and "therefore only required .887 of a second to have cleared the 26 feet necessary to have avoided the collision, that is, 8 feet being the width of the train and 18 feet the length of the truck." She says that the truck "leveled off" and continued at an undiminished speed and from this she contends that the train crew should have been aware of Mr. Hardy's "inattention and obliviousness." She asserts that the best evidence "of what defendant's train could slacken its speed to in a certain distance, as being that in which it did in fact slacken to" and from this she argues that the jury was entitled to conclude that had the engineer "applied the brakes (in emergency) at a distance of 358.8 feet from the crossing, the train would have been delayed adequate time to have avoided the collision." In her argument, after these and numerous other calculations, the respondent evolves a formula and concludes that it was a jury question whether engineer Duncan "should have reacted to the circumstances which indicated a reasonable chance of decedent's inattention, before reaching a distance of 358.8 feet."

It is not necessary here to separate in this elaborate argument "assumptions" from "fact" or from "reasonably permissible inferences." As, for example, the statement or conclusion that there was proof or a permissible inference of Mr. Hardy's "obliviousness" and testimony from which a jury could reasonably draw the further inference that *thereafter* the speed of the train could "have been delayed" and the collision thereby avoided—here by permitting the truck to safely proceed over the crossing. The cases upon which Mrs. Hardy relies illustrate the weakness of her argument that her proof supports the inference of Mr. Hardy's immediate and imminent peril and thereafter the ability to slacken speed sufficiently to have avoided a collision. In the first place, no analysis is necessary to demonstrate, despite her calculations, that this was not "an almost escaping case" as that term has come to be known in humanitarian doctrine parlance, as in Janssens v. Thompson, 360 Mo. 351, 228 S.W.2d 743, a leading and classic case. And this is not to say that expert or opinion testimony is necessary in all humanitarian cases but here there was no direct testimony as to the stopping distances of the train at various speeds and hence proof or a plain inference of slackening in the same distance in which the train could be stopped as in the Janssens case. That the train here stopped in "approximately twelve pole lengths" after Duncan applied the emergency brake does not support the necessary following inference that the train could have been sufficiently slackened by an emergency application of the brakes 358.8 feet from the crossing (assuming, of course, that that was the point at which the duty to act arose). The guest, pedestrian, warning and automobile-truck collision cases are not helpful, particularly in view of the numerous railroad crossing cases.

The principal case upon which the respondent relies, Wabash Railroad Company v. Dannen Mills, Inc., 365 Mo. 827, 288 S.W.2d 926, illustrates the quality of the circumstances, absent expert testimony, required to establish a humanitarian case based on obliviousness imminent peril and slackening speed. In the first place this is not a muddy-road case which in its peculiar circumstances may reasonably show preoccupation of the motorist with his dilemma and hence support the inference of obliviousness as in Womack v. Missouri Pacific

R. Co., 337 Mo. 1160, 88 S.W.2d 368. In the Dannen Mills case, among numerous other compelling factors, the engineer with a train speed of but 30 to 40 miles an hour admittedly saw the approaching truck on a hazardous road with a speed of 40 miles an hour 800 feet from the crossing and testified that if he had braked at 500 feet of the crossing the speed of the train would have been slackened and plainly the truck would have passed over the crossing in safety. Another typical illustration of a slackening speed and almost escaping case is Moody v. Missouri-Kansas-Texas R. Co., Mo., 296 S.W.2d 51.

 It is not necessary to demonstrate in detail that the circumstances pointed to by the respondent do not constitute substantial proof of a humanitarian case based on Mr. Hardy's obliviousness, his imminent peril, and thereafter the ability of the railroad to have sufficiently slackened the speed of the train thereby permitting Mr. Hardy to proceed over the crossing in safety. Having noted the categories of cases into which this one does not fall, it is sufficient to note three cases which closely on their facts control one phase or another of this appeal and illustrate that this case should not have been submitted to the jury on the humanitarian doctrine. In Reedy v. Missouri-Kansas-Texas Railroad Co., Mo., 347 S.W.2d 111, the plaintiff pointed to certain circumstances which she said admitted of a mathematical formula and a humanitarian case of obliviousness (extending the zone of peril) and slackening speed or of a warning. In that case there was proof that had the train's brakes been applied in emergency 375 feet from the point of collision the truck could have passed over the crossing in safety and so the vital question was whether Reedy's obliviousness "should have become reasonably apparent to fireman Garvey during this second interval." The court pointed out that in some circumstances speed may indicate obliviousness and an intention on the part of the motorist of not stopping short of the crossing. But there the speed of the truck was 10 to 12 miles and so could have been stopped in 18 feet and of course slowed or turned aside in a lesser distance, consequently speed did not support the inference of obliviousness "before he (Reedy) drove his truck onto the crossing at which time it was too late for the defendant to avoid the collision." In Bunch v. Missouri Pacific R. Co., Mo., 386 S.W.2d 40, there was no expert testimony and as here the plaintiff called the railroad's engineer as a witness. It is not necessary to detail the facts, the speeds were less, but material here are these excerpts: "A humanitarian case which leaves one or more of the essential elements to guesswork, speculation or conjecture is not for the jury." Again, in that case, there was no reasonably permissible inference of obliviousness to extend the zone of peril and after considering reaction time the court concluded "there was no substantial evidence on which a jury could find that after the plaintiff came into a position of imminent peril the defendant's engineer could have slackened the speed of the locomotive and coal cars sufficiently to have avoided the collision". And finally, in West v. St. L.-S. F. Ry. Co., Mo., 295 S.W.2d 48, the court made very careful computations upon every possibility but material here, particularly to the contention of the truck's ability to pass in safety, the court concluded: "There was no direct evidence as to the location or speed of the train when respondent had reached the point where a jury could have found from appearances that respondent was in imminent peril of the train. * * * There is no basis in the record for any finding that an effective application of the brakes could have within the lapse of 1¼ to 1¾ seconds have delayed the train ½ second in arriving at the crossing. We find no substantial evidence in the record to support a finding that appellants' trainmen, after imminent peril arose, could have slackened the speed of the train and have avoided the collision." (295 S.W.2d l.c. 55.)

On the other hand, her submission of primary negligence is another matter, the

railroad admits that there was substantial evidence of its negligent failure to sound the whistle or ring the bell. Its contention is that nevertheless Mr. Hardy was guilty of contributory negligence as a matter of law. The gist of this assignment is that "(t)he decedent had an unobstructed view of the train when both the train and truck were at least one-fourth mile from the crossing, and the approaching train continued to be in his plain view up to the instant that his truck crashed into the right front of the diesel engine." Of course if all these factors and others equally as compelling appear as they did in three of the cases there could be no recovery because of contributory negligence. Such were the cases of Tietze v. New York, C. & St. L. R. Co., Mo., 250 S.W.2d 486; Borrson v. M.-K.-T. R. Co., 351 Mo. 229, 172 S.W.2d 835; Willis v. Wabash Railroad Co., Mo., 377 S.W.2d 489. But there are several factual dissimilarities in these and other cases relied on by the railroad. For example, in Scott v. Kurn, 343 Mo. 1210, 126 S.W.2d 185, the driver of the tank truck survived and testified and there could be no question as to what he saw and did and with his truck "in second gear" he slowly proceeded onto the tracks and of course was guilty of contributory negligence as a matter of law. In Lohmann v. Wabash Railroad Company, 364 Mo. 910, 269 S.W.2d 885, the decisive point was that the testimony of plaintiff's three principal witnesses was "plainly contrary to the demonstrated physical facts." In Pipes v. Missouri Pacific Railroad Co., Mo., 338 S.W.2d 30, the plaintiff's guest testified to the circumstances and they left no alternative than the conclusion that heedless of a lighted crossing and a lighted diesel the plaintiff either saw or failed to look for a train and in either event was guilty of contributory negligence when he drove onto the crossing.

■ In any event upon this particular record the controlling case is Zumault v. Wabash Railroad Co., Mo., 302 S.W.2d 861. As with all the cases there are differences in facts but in the Zumault case the court took into consideration a number of compelling factors and they are present and applicable to the deceased in this case. In the beginning the court noted several general rules in the light of which the factors were considered. There was the burden of proof: "The burden of proving plaintiff's contributory negligence was on the defendant." And as against the charge of failure to look or listen or to have control of one's vehicle it was said, "Before the court can declare that contributory negligence is shown as a matter of law, such negligence must clearly appear from admitted or conclusively proved facts. If reasonable men may honestly differ with respect to the inferences to be drawn from such facts, then the question whether the driver exercised the care required for his own safety is for the jury." It was pointed out that the circumstances were to be viewed favorably to the plaintiff motorist. The physical surroundings were described and the testimony detailed and from these the factors were selected. Among the factors was the fact that after the automobile driver passed a point 40 feet north of the tracks at which he could see west 1000 feet his view was again obstructed by weeds or underbrush. The train was late, here it was an "extra train," there it was traveling at an estimated speed of 70 to 78 to 100 miles an hour. There the automobile was traveling at a speed of 10 miles an hour when 10 to 15 feet from the track, here the speed of the truck was 40 miles an hour 500 feet from the track. The photographs and plats in that case did not indisputably establish sight distances and other measurements, here there were no plats, only estimates of distances and in several important respects the photographs were inconclusive. As to control of the vehicle it was pointed out that the plaintiff was driving at a lawful, reasonable speed, and the court observed, "(t)he mere fact that plaintiff did not stop his automobile before it fouled the track does not justify the conclusion as a matter of law that he was not exercising the degree of care imposed by law upon the operator of a motor vehicle." The crossing

itself was noted, a narrow single lane for vehicular traffic, here there was a gravel road and a typical country crossing protected only by a wooden cross-arm signal. And finally of course in this case it is admitted that the bell was not sounded in accordance with the statutory admonition, and it is conceded that the plaintiff's evidence supports the finding that the signal by whistle was not timely and properly given. And so, without further demonstration, here as in the Zumault case "(u)nder the facts and circumstances in evidence in this case, the determination of whether the plaintiff was guilty of contributory negligence was for the jury and not the court."

■ Thus the railroad was not entitled to a directed verdict upon the plaintiff's primary negligence submission of failure to properly and timely signal. But the plaintiff-respondent's evidence did not support her humanitarian negligence submission and the consequence is that the jury was instructed upon a theory of which there was no proof. The case was tried and submitted under MAI instructions, and as to the humanitarian doctrine it was not an instance of a case or instruction with "several *elements* which must be submitted in the conjunctive, but these will be in support of a *single theory of recovery or defense.*" The submission here, a supported theory of primary negligence and an unsupported theory of humanitarian negligence, plainly falls within the committee's comment to MAI No. 1.02, p. 7 "the jury should not be instructed on a theory of recovery or defense not supported by the evidence and that any such submission, whether in the conjunctive or disjunctive, should be reversible error. A theory of recovery or defense should not be submitted unless it can stand alone."

In this view it is not necessary to consider whether Instruction 5 submitting primary negligence was also erroneous. Because of the error in submitting a theory of recovery not supported by the evidence

the judgment is reversed and the cause remanded.

STOCKARD, C., concurs.

PRITCHARD, C., not sitting.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

EAGER, P. J., and FINCH, DONNELLY and STORCKMAN, JJ., concur.