Herbert J. FOWLER, Jr.,
Plaintiff-Respondent,

v.

PARK CORPORATION,
Defendant-Appellant.

No. 65313.

Supreme Court of Missouri,
En Banc.

June 19, 1984.

As Modified on Denial of Rehearing
July 17, 1984.

Richard J. Mehan, Jr., Richard O. Funsch, St. Louis, for defendant-appellant.

Morris B. Chapman, Granite City, Ill., Edward L. Dowd, Douglas P. Dowd, St. Louis, for plaintiff-respondent.

BLACKMAR, Judge.

The plaintiff, Herbert J. Fowler, Jr., 19 years old at the time of his injury on October 10, 1978, suffered the loss of both legs above the knee when he was pitched through the bottom of a moving hopper car that was accidentally coupled to a string of rail cars being pulled by a switch engine in an industrial park. He recovered a judgment of $6,000,000 against defendant Park Corporation. The Missouri Court of Appeals, Eastern District, reversed and remanded for a new trial, finding error in the instruction defining "negligent." The case was then certified to us by a dissenting

judge who perceived conflict with *Welch v. Hyatt*, 578 S.W.2d 905 (Mo. banc 1979). We take the case as on original appeal, and affirm the judgment entered on the verdict by the circuit court.

Fowler was employed as a sandblaster by St. Louis Railcar Repair Company (Railcar), which conducted a business of repairing and reconditioning railroad cars at a location in an industrial park leased from the defendant. Railcar is a wholly owned subsidiary of defendant.[1] There were two other tenants in the industrial park who also required rail switching services. Prior to October 2, 1978, Railcar had performed switching operations for itself and the other tenants, without a formal agreement and, so far as the record shows, without consideration moving to it from the others. It used an engine leased from defendant which eventually became unrepairable. Defendant then acquired a new engine and, after October 2, 1978, undertook itself to furnish switching services to all three tenants. There was testimony that the other two tenants had been dissatisfied with Railcar's performance of the services because they thought it gave priority to its own needs. After October 2 defendant's employees did all of the switching during the day shift, which ended at 4 P.M. After that hour the switch engine was available for use, but defendant did not furnish its own employees for a second shift switch crew. There was disagreement about how the switching after 4 P.M. should be characterized—as a continuation of defendant's services to the tenants, or as an operation by the tenant furnishing the crew. We conclude that the jury was entitled to make the appropriate characterization.

On October 10, 1978, defendant's employees operated the switch engine until 4 P.M. Switching work remained undone, and two employees of Railcar, DeHart and Mitan, took possession of the engine. DeHart was a supervisor on the day shift who had stayed over, while Mitan was an employee

on the shift beginning at 4 P.M. The evidence as to the switching they did is conflicting but the jury could have found that they performed switching services for all three tenants during the evening of October 10 and that, in doing so, they were performing services which Park had undertaken to provide for the tenants.

The plaintiff alleges that DeHart and Mitan were not competent to operate the switch engine and that defendant is chargeable with knowledge of their incompetence. DeHart had been employed for a time by Illinois Central Gulf Railroad and fellow employees had allowed him to operate switch engines at times, but he did not operate engines in the course of his duties and he was not supposed to operate them. He had worked for Railcar for approximately eight months and regularly engaged in switching operations. Mitan had participated in switching operations for a former employer on three occasions prior to his employment by Railcar in June of 1977, in which switching was a regular part of his duties. Neither employee had formal instruction or training in switching, in the operation of engines, or in safety precautions. The plaintiff adduced the testimony of an experienced railroad switchman as an expert on the training and experience that an operator of a switch engine should have before being allowed to operate engines alone and on safety precautions which could have been taken. The jury could have concluded from this testimony that DeHart and Mitan lacked the training and experience necessary for the safe operation of an engine of the nature and size here involved and that they were insufficiently instructed in safety precautions. The jury could also decide whether switching operations in an industrial park are fairly comparable to those of established rail carriers, so as to afford credence to the expert testimony.

The accident took place shortly after 7:30 P.M. on October 10. Plaintiff completed a

---

1. It is not claimed that plaintiff's civil action against defendant, parent of the plaintiff's employer, is barred by the Workers' Compensation statutes. *Compare Boswell v. May Centers, Inc.,* 669 S.W.2d 585 (Mo.App.E.D.1984), application for transfer denied.

break and returned to his work in the sand-blasting "shop," which was at the end of Track One. A hopper car was in the shop for service. Other cars were on that track, outside the shop area. Plaintiff and two other employees were working inside the hopper car. Plaintiff was standing in one of the funnels, with his feet on the ground and his body inside the car. At this time the switching crew was trying to couple the other cars. DeHart was operating the engine and Mitan was acting as switchman, on the ground. They accidentally coupled the car in which plaintiff was working and it started to move with the rest of the train. Plaintiff fell through the funnel onto the track and his legs were severed as he tried to climb out from underneath. The jury could have found that DeHart and Mitan were negligent in coupling a car in which people were working, but they were employees of Railcar and more must be shown in order to support a claim of negligence against the defendant.

■ The plaintiff submitted two verdict directing instructions, Number 5, on a theory that DeHart and Mitan were agents of defendant, and Number 7, alleging that DeHart and Mitan were not competent to operate the switch engine and that Park was negligent in entrusting the engine to them. The jury gave no indication as to which theory of recovery it accepted, and so there is legal error unless both instructions are legally correct and supported by evidence.

### I.

Instruction No. 5 reads as follows:

Your verdict must be for Herbert J. Fowler, Jr., against Defendant Park Corporation if you believe:

First, Michael DeHart and Joseph Mitan permitted the car in which Plaintiff was working to be coupled onto the line of railcars being moved by the 1968 switch engine, and

Second, that Michael DeHart and Joseph Mitan were acting within the scope and course of their agency for Park Corporation at the time they permitted the

car in which Plaintiff was working to be coupled onto the line of railcars being moved by the 1968 switch engine, and

Third, Michael DeHart and Joseph Mitan were thereby negligent, and

Fourth, as a direct result of such negligence, Herbert J. Fowler, Jr., sustained damage.

Acts were within the scope and course of agency as that term is used in this Instruction if:

1) They were performed by Michael DeHart and Joseph Mitan to serve the interests of Park Corporation according to an express or implied agreement with Park Corporation, and

2) Park Corporation either controlled or had the right to control the physical conduct of Michael DeHart and Joseph Mitan.

Defendant complains that there is no evidence that DeHart and Mitan were acting for its benefit at the time of the accident, and no showing that it had any right of control over them.

■ The evidence shows that, after October 2, 1978, defendant undertook to provide switching services for all tenants at the industrial complex because of dissatisfaction with Railcar's switching. It may be assumed that defendant wanted to please its tenants and to attract others. There was evidence that DeHart and Mitan, on the evening of October 10, were switching for other tenants besides Railcar. Any conflict in evidence, of course, was for the jury to resolve. From the evidence just described the jury could conclude that DeHart and Mitan were doing the defendant's work on the evening of October 10, so as to support the agency element submitted in the instruction.

■ Defendant argues that there is no evidence that it had the "right to control" DeHart and Mitan in their operation of the engine. Defendant owned the engine. It had the right to lend it on any terms it thought necessary, to prescribe operating rules, to specify the employees of the borrower who would be permitted to use it,

and to withdraw it at any time. Right to control may exist even though the controller is not in the presence of the persons and instrumentalities which are subject to control. *Johnson v. Pacific Intermountain Exp. Co.*, 662 S.W.2d 237 (Mo. banc 1983). The evidence sufficiently establishes defendant's right to control.

## II.

Instruction No. 7 reads as follows:

Your verdict must be for Herbert J. Fowler, Jr., against Defendant Park Corporation if you believe:

First, Defendant Park Corporation loaned the 1968 switch engine to Michael DeHart and Joseph Mitan, and

Second, that at the time Defendant Park Corporation loaned said switch engine to Michael Dehart and Joseph Mitan, Michael DeHart and Joseph Mitan were incompetent to operate said switch engine, and

Third, at the time Defendant Park Corporation loaned the 1968 switch engine to Michael DeHart and Joseph Mitan, it knew or should have known that they were incompetent to operate the switch engine, and

Fourth, that in loaning the 1968 switch engine to Michael DeHart and Joseph Mitan, Defendant Park Corporation was thereby negligent, and

Fifth, that Michael DeHart and Joseph Mitan thereafter permitted the railcar in which Herbert J. Fowler, Jr., was working to be coupled onto the line of railcars being moved by the 1968 switch engine, and

Sixth, Michael DeHart and Joseph Mitan were thereby negligent, and

Seventh, such negligence of Michael DeHart and Joseph Mitan directly combined with the negligence of Defendant Park Corporation to cause damage to Herbert J. Fowler, Jr.

■ The defendant has three complaints about this instruction, as follows: (a) that there is no evidence that Park entrusted the engine to DeHart and Mitan; (b) that there is no evidence that Mitan operated the engine, and so his competence would be immaterial; and (c) that the instruction should have used the phrase "knew or had reason to know" rather than "knew or should have known." We respond to the matters briefed under the facts and circumstances available to the jury, such as the nature of the entrusted item, the defendant's means of knowledge, and the regular entrustment for a part of each day. It is not expected that an MAI-type instruction be a legal treatise. We conclude that the instruction was not erroneous.

■ The evidence amply demonstrates that an engine of the size and power of the one involved in this case had potential for danger and should be operated only by a skilled and trained person. Defendant, in loaning the engine to Railcar, had a duty to make sure that Railcar allowed only competent persons to operate it. Restatement (Second) of Torts §§ 390, 391.

The evidence further shows that DeHart and Mitan obtained the engine from the defendant at 4:00 P.M. on October 10, 1978, this being "quitting time" for Park employees and the beginning of Railcar's second shift. DeHart, a supervisory employee of Railcar, stayed past his normal hours because of the volume of unfinished switching. He had not operated the engine while the defendant was doing the switching. It was not necessary to show that defendant's employees actually witnessed the take-over of the engine by DeHart and Mitan because the jury could have found that defendant entrusted the engine to them by simply making it available for Railcar to take possession through whatever employees it detailed. This conclusion is fortified by the evidence permitting the jury to find that Railcar's employees were doing the defendant's work at the time of the accident. *See* the discussion in Part I above.

■ The issue of negligent entrustment, then, was adequately submitted to the jury by the requested instruction. To hold otherwise would put a premium on technicalities. To say that the engine was entrusted to Railcar implies that it was entrusted to

some agent or employee of Railcar, for a corporation can act only through its agents. *Schneider v. Schneider*, 347 Mo. 102, 146 S.W.2d 584, 589 (1940); *Standard Meat Company v. Taco Kid of Springfield, Inc.*, 554 S.W.2d 592, 595 (Mo.App.1977). The jury, therefore, well could have found that the designated agents were DeHart and Mitan, and that the defendant entrusted the engine to them.

Defendant argues that there is prejudicial error in submitting the incompetence of both DeHart and Mitan, arguing that there was no evidence that Mitan operated the engine. Mitan, at the time of plaintiff's accident, was working as switchman, giving signals on the ground. The argument fails because the submission is in the conjunctive and therefore expressly requires the jury to find that DeHart was incompetent.[2] The jury could not have rendered a verdict, under this instruction, solely on a finding of Mitan's incompetence. The evidence also shows that at least one switchman is an essential member of a switching crew, and that Mitan was negligent.

We decline to find reversible error in the use of the phrase "knew or should have known" instead of "knew or had reason to know." Defendant cites *Evans v. Allen Auto Rental and Truck Leasing*, 555 S.W.2d 325 (Mo. banc 1977) in support of its claim that the latter phraseology is essential in the submission of a claim for negligent entrustment under Missouri law, but *Evans* had no occasion to consider the distinction between the two formulations. The Second Restatement of Torts, § 12, expounds a refined legal analysis, declaring that "should have known" applies only to a situation in which there is a duty to inquire as to the competency of the entrustee.[3] By this analysis, the instruction given in this case is not in error, because, as we have said earlier, one who entrusts an engine of the proportions of the one here involved to others has a duty to inquire as to competency of the intended operators. It may perhaps be assumed that most adults are qualified to drive automobiles, but no such assumption is justified as to switch engines. The court of appeals opinion, furthermore, demonstrates that Missouri courts have used the two phrases interchangeably for many years.[4] The defendant, at the very least, should have presented a request at the instruction conference (Rule 70.02(a)), if of the opinion that it was entitled to an instruction phrased precisely as it now urges.

### III.

The Court of Appeals found prejudicial error because the court, at plaintiff's request, used MAI 11.02 II[5] instead of MAI 11.02 I[6] in defining "negligent" and "negli-

---

**2.** *See Corley v. Kroger Grocery & Baking Co.,* 355 Mo. 4, 193 S.W.2d 897, 900 (1946), in which plaintiff's verdict-directing instruction submitted several charges of negligence in the conjunctive. We held that where there is substantial evidence supporting one or more, but not all of the conjunctives, the giving of the instruction is not reversible error. Even though MAI 1.02 now prohibits the use of conjunctives in submitting theories of recovery on defense, the proposition enunciated in *Corley* is logically sound and the isolated use of the conjunctive in this instance is not the kind of abuse condemned.

**3.** Comment a to the Restatement (Second) of Torts § 12 provides:

Both the expression "reason to know" and "should know" are used with respect to existent facts. These two phrases, however, differ in that "reason to know" implies no duty of knowledge on the part of the actor whereas "should know" implies that the actor owes another the duty of ascertaining the fact in question.

**4.** *See Bell v. Green,* 423 S.W.2d 724 (Mo. banc 1968); *Dinger v. Burnham,* 360 Mo. 465, 228 S.W.2d 696 (1950); *Stafford v. Far-Go Van Lines, Inc.,* 485 S.W.2d 481 (Mo.App.1972); *Thomasson v. Winsett,* 310 S.W.2d 33 (Mo.App. 1958); *Lix v. Gastian,* 261 S.W.2d 497 (Mo.App. 1953).

**5.** MAI 11.02 II provides that

The term "negligent" or "negligence" as used in this [these] instruction[s] means the failure to use that degree of care that a very careful and prudent person would use under the same or similar circumstances.

**6.** MAI 11.02 I provides that

The term "negligent" or "negligence" as used in this [these] instruction[s] means the failure to use that degree of care that an

gence". The only difference between these instructions is that the instruction used defined these words in terms of the care that "*a very careful* and prudent person" would use, whereas the definition should have been in terms of the care that "*an ordinarily careful* and prudent person" would use. (Emphasis supplied in each instance). The Court of Appeals observed that the definition used in this case is appropriate in the unusual situation in which a defendant is obliged to use "the highest degree of care." The majority concluded that the appropriate standard in the entrustment and operation of railroad locomotives is only one of "ordinary care." Judge Pudlowski dissented and then certified the case to us, asserting that it was in conflict with *Welch v. Hyatt,* 578 S.W.2d 905 (Mo. banc 1979).

■ We do not believe that it is necessary to reverse this judgment because of this difference in a single word in the definition instruction. Let us concede that there are relatively few situations in which our Court has held that a defendant is obliged to use the "highest" degree of care. The one most often found is the statutory requirement of the exercise of the highest degree of care in the operation of motor vehicles on the highways. *See* 304.010.1, RSMo Cum.Supp.1983. The courts have added a few other situations.[7] Defendant-appellant cites numerous cases holding that railroading operations impose only a duty of ordinary care,[8] although there is some

authority indicating a higher duty.[9] It also remains the law of Missouri that there are no legal degrees of negligence. *Virginia D. v. Madesco Investment Corp.,* 648 S.W.2d 881, 886 n. 11 (Mo. banc 1983). Thus, by the clear weight of authority, the appropriate standard for this case is "ordinary care," and there is presumed error under Rule 70.03 in the giving of MAI 11.02 II rather than MAI 11.02 I.

■ The rule, nevertheless, requires us to determine whether the error in definition was prejudicial, and we must also consider the plaintiff's argument that defendant waived its claim of error by accepting or condoning the erroneous definition. We doubt very much that the variation in a single word was a circumstance which had a substantial effect on the jury. Plaintiff's counsel made no attempt to exploit the given definition in argument. Nowhere in the instruction is the phrase "highest degree of care" used. The prudent choice for plaintiff's counsel would have been the submission of 11.02 I, because counsel's submission of 11.02 II might be viewed as an effort to obtain a slight but nevertheless unauthorized edge. It is also possible that the request was made inadvertently and was occasioned by lack of familiarity with the local law. There is authority in past cases for reversing in circumstances such as these, because of the conviction that discipline is necessary to "keep counsel honest" in framing instructions.[10] We be-

---

ordinarily careful and prudent person would use under the same or similar circumstances.

7. *See, e.g., Mrad v. Missouri Edison Co.,* 649 S.W.2d 936 (Mo.App.1983), utility company required to exercise the highest degree of care in preventing injuries from its power lines; *Wagstaff v. City of Maplewood,* 615 S.W.2d 608 (Mo. App.1981), a very high degree of care required by an ordinarily careful person when handling firearms; *Lottes v. Pessina,* 174 S.W.2d 893 (Mo. App.1943), the highest duty of care required in the handling of explosives.

8. *See, e.g., Lesch v. Terminal R.R. Ass'n of St. Louis,* 258 S.W.2d 686 (Mo.1953); *Pritt v. Terminal R.R. Ass'n of St. Louis,* 359 Mo. 896, 224 S.W.2d 119 (1949); *Carner v. St. Louis-San Francisco Ry. Co.,* 338 Mo. 257, 89 S.W.2d 947 (1935); *Burch v. Cleveland, C., C. & St. L. Ry.*

*Co.,* 328 Mo. 59, 40 S.W.2d 688 (1931); *Chandler v. Chicago & A.R. Co.,* 251 Mo. 592, 158 S.W. 35 (1913); *Koehler v. Burlington Northern, Inc.,* 573 S.W.2d 938 (Mo.App.1978); *Hudgens v. St. Louis & S.F.R. Co.,* 139 Mo.App. 44, 119 S.W. 522 (1909).

9. *See Brown v. The Hannibal & St. Joseph R.R. Co.,* 50 Mo. 461 (1872), where this Court held that the trial court correctly instructed the jury that "[r]ailroad companies, owing to the dangerous character of the business they engage in, are held to the greatest care in the operation of their machinery and vehicles."

10. *See, e.g., Schlegel v. Knoll,* 427 S.W.2d 480 (Mo.1968); *Oesterreicher v. Grupp,* 119 S.W.2d 307 (Mo.1938); *Borgstede v. Waldbauer,* 337 Mo. 1205, 88 S.W.2d 373 (banc 1935); *Schneider v.*

lieve that there are ample controls and that we should reverse only for defects of substance with substantial potential for prejudicial effect.

This case presents a patent illustration of "sandbagging," in which counsel remains silent at the instruction conference in the hope that his opponent will request an erroneous instruction,[11] as the following exchange shows:

> THE COURT: Do you want to make any specific objections to any of the instructions?
>
> [DEFENDANT'S COUNSEL] As I understand the rules, that you don't have to make any specific objections now, you can wait until you file your motion for new trial.
>
> THE COURT: That's what the rules so indicate, but I wanted to afford you an opportunity to enlighten the Court if you happen to see fit.
>
> [DEFENDANT'S COUNSEL] I didn't see anything wrong with them, Your Honor, at this point.

In most instances the law requires counsel to speak out in time to permit correction of trial error. Present Missouri practice does not require this for claims of error in instructions. Rule 70.03 condones sandbagging.

 Counsel in this case, however, went beyond the simple withholding of an objection. Converses were submitted to both verdict directors using the word "negligent." Rule 70.02(f), providing that a request for a converse does not waive the right to challenge the conversed instruction, is not an obstacle to inquiry about waiver or condonation in this case, because the verdict-directing instructions, rather than the definition, were conversed, and the challenge now under consideration goes only to the latter. The defendant squarely joined issue on the terms which the plaintiff had defined. Had the alternate definitions been offered the court would have had the opportunity to correct the error, and undoubtedly would have done so on examining the Notes on Use to MAI. It is, therefore, appropriate to find a waiver of further definition under these circumstances.[12]

 The defendant also used the definition instruction in argument. It is asserted that, once the term was defined in an instruction, the defendant would not be able to use in argument any definition other than the one given by the court. The plaintiff, however, argued in terms of "ordinary care" and the defendant could surely have accepted and joined in this definition. *Welch v. Hyatt, supra,* properly holds that the argument may be looked to to determine whether possibly erroneous instructions had likely prejudicial impact. Here plaintiff's counsel did not make any use at all of the distinction between "ordinarily careful" and "very careful."

 Litigants of course are entitled to a submission which is legally correct. If counsel is presented with an instruction containing a patent error, and is of the

*Bi-State Development Agency,* 447 S.W.2d 788 (Mo.App.1969); *Van Brunt v. Meyer,* 422 S.W.2d 364 (Mo.App.1967).

11. *See Hudson v. Carr,* 668 S.W.2d 68 (Mo. banc 1984) and *Looney v. Hindman,* 649 S.W.2d 207 (Mo. banc 1983). *And see* opinion of Gunn, J., in *Love v. State,* 670 S.W.2d 499 (Mo. banc 1984) (No. 65337, decided May 15, 1984); Blackmar, "Instructions and Reversals," 36 *Journal of the Missouri Bar* 24 (1980).

12. *See Kansas City Southern Ry. Co. v. Payway Feed Mills, Inc.,* 338 S.W.2d 1, 9–10 (Mo.1960), defendant desiring additional or supplemental definitions to the definitions given by plaintiff, had both the privilege and duty to offer instructions for that purpose; *Fowler v. Laclede Gas Co.,* 488 S.W.2d 934, 937 (Mo.App.1972), failure of defendant to give a definition of "ordinary care" in its converse instruction after plaintiff failed to define the terms in his verdict director would not amount to reversible error against plaintiff; *Green v. St. Louis-San Francisco Ry. Co.,* 224 Mo.App. 517, 30 S.W.2d 784, 789 (1930), where defendant did not request further or different definition of "fraud or mistake" than the definition given by the court, defendant waived any possible error in definition; *Ashby v. Elsberry & N.H. Gravel Road Co.,* 111 Mo.App. 79, 85 S.W. 957, 959 (1905), defendant was deemed to have adopted plaintiff's definition of "ordinary care" when it used the terms in its own instruction without further definition.

opinion that the instruction might make argument more difficult or have a substantial effect on the jury, it is perfectly possible to request a correct instruction at the instruction conference mandated by Rule 70.02(a). Lawyers take a chance in deliberate silence in the face of error, inasmuch as Rule 70.02(c) does not command reversal simply because there is a deviation from MAI. There is a risk that the court will find that the error is not prejudicial so as to require reversal.

Retrials are burdensome. There has been in recent years a trend away from reversal for error in instruction, unless there is a substantial indication of prejudice. This trend appears both in civil [13] and in criminal [14] cases. The very adoption of MAI, indeed, demonstrates confidence that the issues may be presented to juries through argument and that prolix factual instructions are neither necessary nor desirable. Our conclusion is consistent with this observed trend.

It is also argued that the plaintiff's requested instructions were not in proper form as required by Rule 70.02(d), in that the sources in MAI were not set out. Defendant complains about not knowing where the instructions came from, with attendant difficulties in preparing a motion for new trial. Simple methods of determining the source of the instructions are to ask opposing counsel at the instruction conference, or to object to a submission which is not in compliance with the rules. Defendant did not make use of either of these alternatives. There is no basis in the rules or in sound practice for not voicing this kind of complaint at the time the instructions are tendered.

What has just been said disposes of the defendant's observation that Instruction No. 5 reversed the order of the first and second paragraphs, contrary to the command of MAI 18.01. Defendant concedes

that this point was not preserved in the motion for new trial, but seeks to excuse this on the ground that it was not provided a key to the instructions so as to be able to frame a specific objection. The excuse is not sufficient for the reasons just outlined, and there surely is no plain error.

### IV.

The defendant also argues that the size of the verdict "conclusively" demonstrates that it was impacted with passion and prejudice. The defendant relies on three instances in which it is claimed that plaintiff's counsel employed a "golden rule" argument, inviting the jurors to put themselves in the position of the plaintiff, and argues that this improper argument must necessarily have influenced the jury to return an excessive verdict.

We do not agree. The defendant objected to the arguments now adduced and the trial judge promptly sustained the objection, directing the jury to disregard the argument. No motion for mistrial was made until the conclusion of the argument. In matters of this kind we normally place great reliance on the trial judge, who can view the entire argument in context, and there is no reason why this case should be treated differently. The questioned passages are not flagrant, and probably did no more than to suggest what must necessarily have occurred to the jurors about the plaintiff's tragic situation. The defendant was not always circumspect in its argument, and on occasion interjected the issue of workers' compensation payments. The trial judge is better equipped than we are to determine whether the verdict was tainted by improper argument. We have often said that the parties are entitled to a fair trial but not necessarily a perfect one.

The verdict, of course, is very large— larger than any that can be found in any personal injury case in the official reports

**13.** *See* cases cited at note 11, *supra.*

**14.** *See, e.g., State v. Betts,* 646 S.W.2d 94 (Mo. banc 1983); *State v. McIlvoy,* 629 S.W.2d 333 (Mo. banc 1982); *State v. Newlon,* 627 S.W.2d 606 (Mo. banc 1982), *cert. denied,* 459 U.S. 884,

103 S.Ct. 185, 74 L.Ed.2d 149 (1982); *State v. White,* 622 S.W.2d 939 (Mo. banc 1981), *cert. denied,* 456 U.S. 963, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982).

of Missouri decisions. But the plaintiff's situation is pathetic. He was 19 years old at the time of the accident and has a life expectancy, according to the tables, of 50 years. He has not used prosthetic devices successfully. He will need constant care and medical attention, and his employability is doubtful. He is obviously incapable of leading a normal social life. Once the jury found liability a very large award was in order.

▪ The plaintiff did not put on economic evidence of damage, other than by showing that he stood to lose approximately one million dollars in earnings, based on present wage levels, and that he would have to hire 'round the clock attendants after his parents, who are infirm, became unavailable to care for him. The defendant did not suggest an alternative figure but simply argued that the amount sought was very excessive. Each party apparently pursued a deliberate strategy. The circumstance that the jury accepted the only figure suggested to it does not, in and of itself, demonstrate any reason for tampering with the verdict.

▪ The day is past when this Court and the courts of appeals engage in close scrutiny of the amounts awarded by juries for personal injuries.[15] We rely on the trial judge. Judge Tillman called for briefing on the amounts awarded in comparable cases, and then allowed the verdict to stand. We do not believe that we should supersede his judgment. We do not disclaim our authority, or that of the courts of appeals, to give attention to the size of verdicts, or to order remittiturs if persuaded that there had been a clear abuse of

discretion. There may be cases in which the award is so far out of line, when compared to the tangible damages shown, that the appellate court would be impelled to take corrective action. This case is not one of them.

We conclude that the issues of liability and damages were fairly tried and that the record is free from prejudicial error. The judgment of the circuit court is affirmed.

RENDLEN, C.J., and GUNN and BILLINGS, JJ., concur.

WELLIVER, HIGGINS and DONNELLY, JJ., dissent in separate opinions filed.

WELLIVER, Judge, dissenting.

I respectfully dissent.

In my opinion the trial court erred in submitting this case under a theory of negligent entrustment. The evidence shows that defendant for several years leased an old engine to Railcar and that this engine was under the control of Railcar at all times. In the fall of 1980, defendant purchased a new engine and thereafter agreed to loan it to Railcar, after 4 p.m. each day. There was no evidence before the jury suggesting that defendant knew or had reason to know that Railcar employed persons who were not fully trained to operate the engine at the time this arrangement was instituted on October 2, 1978. Nor is there any indication that defendant had become aware of DeHart's or Mitan's ill-training prior to the accident from which this suit arises. It seems clear to me, therefore, that plaintiffs failed to satisfy one of the elements of negligent entrustment, as set forth in *Evans v. Allen Auto Rental & Truck Leas-*

---

**15.** From the early days of statehood, Missouri appellate courts followed the rule that damage judgments should conform with judgments entered in like cases. Up until the late 1950's this "rule of uniformity" was strictly adhered to in considering the excessiveness of damage awards. *See Carnes v. Kansas City Southern Ry. Co.,* 328 S.W.2d 615 (Mo.1959); *Chitty v. St. Louis, I.M. & S. Ry. Co.,* 148 Mo. 64, 49 S.W. 868 (1899). Recent Missouri appellate decisions, however, indicate that the "rule of uniformity" is no longer the sole factor considered in reviewing the excessiveness of damage awards.

Instead, the rule is a standard of reasonableness of the verdict taking into consideration "the nature and extent of the injuries, ... the diminished earning capacity, economic conditions, plaintiff's age, and a comparison of the compensation awarded and permitted in cases of comparable injuries." *Graeff v. Baptist Temple of Springfield,* 576 S.W.2d 291, 309 (Mo. banc 1978). *See also Chism v. White Oak Feed Co.,* 612 S.W.2d 873, 884 (Mo.App.1981); *Ricketts v. Kansas City Stock Yards of Maine,* 537 S.W.2d 613, 619 (Mo.App.1976).

*ing, Inc.*, 555 S.W.2d 325, 326 (Mo. banc 1977), namely "that the entrustor knew or had reason to know of the entrustee's incompetence." *Id.*

The principal opinion concludes that the jury *could have found* that defendant *should have known* of DeHart's and Mitan's lack of training because, in its view, "[d]efendant, in loaning the engine to Railcar, had a duty to make sure that Railcar allowed only competent persons to operate it." The imposition of such a duty is, so far as I can determine, unprecedented. Certainly the authorities cited provide no support. The language and comments of §§ 390 and 391 of the Restatement (Second) of Torts leave no doubt that the drafters of the Restatement contemplated holding an entrustor liable only when, at the time of the entrustment, the entrustor had actual knowledge of the entrustee's incompetence or had reason to know of the incompetence from the attending circumstances. No court in any jurisdiction has interpreted §§ 390 and 391 to require a donor or lessor of equipment to affirmatively investigate whether the lessee's employees are competent to operate the equipment. *Compare Hetherton v. Sears, Roebuck & Co.*, 445 F.Supp. 294, 302 (D.Del. 1978), rev'd. on other ground, 593 F.2d 526 (3d Cir.1979) (no duty to investigate the background of entrustee); *Altman v. Morris Plan Co.*, 58 Cal.App.3d 951, 130 Cal. Rptr. 397, 403 (1976). The principal opinion citation of *Henderson Brothers Stores, Inc. v. Smiley*, 120 Cal.App.3d 903, 174 Cal.Rptr. 875 (1981),[1] is inexplicable. Nothing stated or suggested in the opinion supports the proposition attributed to the case by the principal opinion.

Nor do the prior negligent entrustment cases in this state provide any basis for imposing the duty imposed by the principal opinion. *See Evans v. Allen Auto Rental & Truck Leasing, Inc., supra; Bell v. Green*, 423 S.W.2d 724 (Mo. banc 1968); *Clark v. Martin*, 650 S.W.2d 699 (Mo.App. 1983); *Peters v. Henshaw*, 640 S.W.2d 197 (Mo.App.1982); *Sampson v. W.F. Enterprises, Inc.*, 611 S.W.2d 333 (Mo.App.1981). *See also Hendrickson v. Cumpton*, 632 S.W.2d 512 (Mo.App.1982); *Heafner v. Safeco Nat'l. Insurance Co.*, 613 S.W.2d 478 (Mo.App.1981); *Herrera v. Reicher*, 608 S.W.2d 539 (Mo.App.1980); *Newson v. City of Kansas City*, 606 S.W.2d 487 (Mo.App. 1980).

So extraordinary is the duty imposed by the majority today that I can only surmise they fail to comprehend its ramifications. As a result of the principal opinion, it would appear that donors and lessors of equipment and other chattel must investigate the qualifications of every employee of the firm acquiring the equipment who may operate it. Not only must donors and lessors make such an investigation at the time of the initial entrustment, but under the unqualified language of the principal opinion, it would appear they must also evaluate any employees who subsequently are hired.

It boggles the mind to consider all of the ramifications of this new duty on the leas-

---

1. The citation of this case has been withdrawn from the principal opinion. This California case and sections 390 and 391 of the Restatement (Second) of Torts are the only authorities relied upon by the principal opinion as authority for the result reached. Sections 390 and 391 provide:

 Chattel for Use by Person Known to be Incompetent

 One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

 Chattel Known to be Dangerous

 One who supplies directly or through a third person a chattel for another to use for the supplier's business purposes, knowing or having reason to know that it is or is likely to be dangerous for the use for which it is supplied, is subject to liability as stated in §§ 388–390.

There is no testimony in the record that appellant supplier either knew or had reason to know prior to the accident that DeHart and Mitan might be incompetent to operate the engine.

There is no testimony suggesting that this particular engine was inherently dangerous or differed in any way from any ordinary engine.

ing industry in this state. One of the vehicles most used today for financing airplanes, buses, boats, and virtually all heavy construction equipment is the lease. Much of long-term automobile financing and all daily rental of automobiles involve leasing. Are banks, financial companies, small equipment leasing companies,[2] and daily automobile leasing companies all to be held to the same standard of care herein saddled on the owner of the railway engine?

Negligent entrustment is a theory of vicarious liability designed to enable a plaintiff to reach a lessor who would not otherwise be liable. The theory of negligent entrustment developed with the coming of the automobile where an owner negligently loaned (or leased) his automobile to persons known to be incompetent to operate the vehicle. I respectfully submit that the majority creates a theory of negligent entrustment never heretofore contemplated in the law and that in so doing, they jeopardize the future of the entire leasing and lease-financing industry of Missouri.

HIGGINS, Judge, dissenting.

Appellant's principal contention, in my opinion dispositive of this appeal, is the charge that the trial court erroneously instructed the jury with respect to the degree of care enjoined on defendant by M.A.I. 11.02 II given as Instruction No. 3.

This instruction told the jury that the defendant owed plaintiff the highest duty of care—the duty of care that "a very careful and prudent person" would use in the circumstances of this case. The principal opinion (Section III) acknowledges that the court should have given M.A.I. 11.02 I to tell the jury that the defendant owed plaintiff the ordinary duty of care—the duty of care that "an ordinarily careful and prudent person" would use in the circumstances of this case. The opinion thus demonstrates the gravity of the misdirection on the standard of care; nevertheless it undertakes to excuse the error.

The law in Missouri is that imposition upon a defendant of a standard of care greater than that required by law is prejudicially erroneous and requires reversal. *Schlegel v. Knoll*, 427 S.W.2d 480, 485[10] (Mo.1968); *Borgstede v. Waldbauer*, 337 Mo. 1205, 88 S.W.2d 373, 374[4] (Mo. banc 1935); *Oesterreicher v. Grupp*, 119 S.W.2d 307, 308[1] (Mo.1938). In *Schneider v. Bi-State Development Agency*, 447 S.W.2d 788, 791[7] (Mo.App.1969) the court held that an instruction which imposed upon a defendant a "highest degree of care" standard when the law required that it exercise "ordinary care" was prejudicially erroneous and required that a judgment entered in the case be reversed and the cause remanded.

Nor can the principal opinion excuse the prejudicial effect of the instructional error by attributing to the defense improper motives and accusing counsel of "sandbagging." The defendant acted within its rights when it did not object at trial to the now questioned instructions. Rule 70.03 is explicit:

> Counsel need not object to any instruction to be given at the request of any other party or by the court on its own motion or to the refusal of any instructions requested by such party. Specific objections to instructions shall be required in motions for new trial unless made at trial. The making of objections during trial shall not preclude making additional objections to the same or other instructions in the motion for new trial. No general objection to instructions is required.

Thus, a party does not have a duty at trial to correct an erroneous and misleading instruction of his opponent in order to challenge it, even when that instruction imposes an inappropriate standard of care. *Van Brunt v. Meyer*, 422 S.W.2d 364, 369[2, 3] (Mo.App.1967); *Brooks v. Bernard*, 236 S.W.2d 46, 48 (Mo.App.1951). Allegations of instructional error may be preserved either by specific objection at trial or in the

---

2. *i.e.* rental companies that rent and lease backhoes and their accessories, lawn mowers, chain saws, tractors, jacks, electric saws and drills, and all other "do it yourself" type of equipment.

motion for new trial. *Romines v. Donald Maggi, Inc.*, 636 S.W.2d 130, 132 (Mo.App. 1982). Under this Court's own rules, then, defendant's pursuit of its allegation of error in the motion for new trial was entirely permissible and cannot be invoked as a basis for excusing a fatally erroneous instruction.

Because the jury was erroneously and prejudicially instructed on the defendant's duty of care, the judgment should be reversed and the cause should be remanded for a new trial.

DONNELLY, Judge, dissenting.

Appellant Park Corporation operates a railroad industrial yard where it provides railcar switching services to its tenants. On October 2, 1978, Park placed a newly purchased engine in operation at the industrial yard. From October 2, 1978, until October 10, 1978, Park operated the engine and provided switching services to its tenants during the daytime. During this same period, St. Louis Railcar Repair, a wholly owned subsidiary of Park and one of its tenants at the industrial yard, borrowed and operated the engine at night.

Respondent Herbert J. Fowler, Jr., was employed by Railcar Repair. On the night of October 10, 1978, Fowler was sandblasting the inside of a "hopper" car. On that same night two other Railcar Repair employees, Michael DeHart and Joseph Mitan, were using the borrowed engine to switch cars for Railcar Repair. They inadvertently coupled onto the "hopper" car on which Fowler was working and moved it several hundred feet. The unfortunate result was that Fowler was thrown underneath the "hopper" car and both of his legs were severed from his body.

Fowler filed suit against Park, asserting (1) that the two Railcar Repair employees conducting the switching operations were "agents" of Park, and (2) that Park negligently entrusted the engine to them. The jury returned a verdict for Fowler and against Park for $6,000,000.00.

Fowler submitted his case to the jury on alternative theories of agency and negligent entrustment. It is settled in Missouri that a "jury should not be instructed on a theory of recovery * * * not supported by the evidence and that any such submission, whether in the conjunctive or disjunctive, * * * is reversible error." MAI 3rd [1981 § 1.02, at 8]; *Hardy v. St. Louis-San Francisco Railway Co.*, 406 S.W.2d 653 (Mo.1966).

In *Evans v. Allen Auto Rental and Truck Leasing, Inc.*, 555 S.W.2d 325, 326 (Mo. banc 1977), this Court held that the elements which must be shown in order to invoke the doctrine of "negligent entrustment" are:

(1) that the entrustee is incompetent by reason of age, inexperience, habitual recklessness or otherwise;

(2) that the entrustor knew or had reason to know of the entrustee's incompetence;

(3) that there was an entrustment of the chattel; and

(4) that the negligence of the entrustor concurred with the conduct of the entrustee as a proximate cause of the harm to plaintiff.

There is no evidence in the record that any Park official knew of the operation of the engine by DeHart and Mitan. In this circumstance, (2), (3), and (4) of the *Evans* elements are missing. The giving of the "negligent entrustment" instruction was prejudicial error.

The principal opinion dismantles further the law of torts constructed by our predecessors. *See also Virginia D. v. Madesco Investment Corp.*, 648 S.W.2d 881 (Mo. banc 1983) and *Johnson v. Pacific Intermountain Express Co.*, 662 S.W.2d 237 (Mo. banc 1983). It evidences again an abandonment of the traditional common law process and the adoption of a model which "would legitimate the use by a judge of his individual feeling as the standard by which he would decide [law] questions." Donnelly, The State of the Judiciary in Missouri-1982, 3 St. Louis U.Pub.L.Forum 101 (1983). *See R.* Bridwell and R. Whitten, *The Constitution and the Common*

*Law* 14 (Lexington, Mass.: Lexington Books, 1977).

I have no taste for judicio-political subjectivism. It serves to impose "WILL instead of JUDGMENT." *The Federalist,* No. 78.

I respectfully dissent.